## Richmond

ROBERT Y. BUTTON, ATTORNEY GENERAL OF VIRGINIA (PENINSULA PORTS AUTHORITY OF VIRGINIA) v. SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

November 30, 1964.

Record No. 5954.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*F. O. Blechman, Special Assistant to Attorney General (Robert Y. Button, Attorney General; Kenneth C. Patty, Assistant Attorney General; E. Sclater Montague, Special Assistant to Attorney General,* on brief), for the petitioner.

*Howard W. Dobbins (David C. Dorset; Wallerstein, Goode, Adamson Dobbins,* on brief), for the respondent.

SPRATLEY, J., delivered the opinion of the court.

Robert Y. Button, Attorney General of Virginia, brought this action on behalf of the Peninsula Ports Authority of Virginia, praying that this Court consider and determine whether Section 11 of Chapter 39, Acts of Assembly 1964, amending Chapter 46, Acts 1952, hereinafter referred to as the Enabling Act, is a valid enactment and not in violation of any of the provisions of the Constitution of Virginia; that a certain agreement and contract proposed to be made thereunder are likewise valid and constitutional in all respects; and that a writ of mandamus be issued by this Court requiring Sidney C. Day, Jr., Comptroller of Virginia, to issue warrants upon the Treasurer of Virginia for the payment of such amounts as may be authorized by vouchers of the Peninsula Ports Authority of Virginia.

In his petition, the Attorney General alleged:

I.   That under the above mentioned Enabling Act, the Peninsula Ports Authority of Virginia (Authority) was created "a body politic and corporate and a political subdivision of the Commonwealth of Virginia," with the power and duty to acquire, lease, construct, maintain and operate port facilities, and to issue revenue bonds to pay the cost of all or part of such facilities, upon such terms and conditions as the Authority "shall determine to be in the public interest;"

II.   That the General Assembly of Virginia at its 1958 session by the adoption of House Joint Resolution No. 70, Acts 1958, page

1104, recognized that port improvement and development through public means would advance the economy, prosperity and welfare of the State;

III.   That the General Assembly, at its 1962 session, appropriated for the biennium 1962-1964, $100,000.00 to the Virginia State Ports Authority for the acquisition, development, construction and operation of port facilities, with the provision that in the event the Authority was unable to acquire or develop port facilities at any port as proposed pursuant to House Joint Resolution No. 70, the funds should be available, subject to the approval of the Governor, to any other political subdivision having authority to acquire, own, construct, operate or lease port facilities;

IV.   That the General Assembly, at its 1964 session, included in the appropriation for the biennium 1964-1966, to the Virginia State Ports Authority, "for one-half the annual cost for acquisition, development, construction and operation of port facilities at Newport News, a sum sufficient, not to exceed in any one year the amount appropriated ($757,500) annually herein for port facilities at Norfolk," Item 190, Acts 1964, page 1026;

V.   That the Virginia State Ports Authority had, by Resolution adopted June 8, 1964, determined that it was unable to acquire, develop or operate port facilities at Newport News, and recommended to the Governor of Virginia "that he approve, making available to the Peninsula Ports Authority of Virginia the sum of $5,000 appropriated for the fiscal year ending June 30, 1964, for the acquisition, development, construction and operation of port facilities at Newport News, and a sum sufficient not to exceed $757,500 for each of the fiscal years ending June 30, 1965 and June 30, 1966 for one-half the annual cost of acquisition, development, construction and operation of port facilities at Newport News, pursuant to the 1964 Act;"

VI.   That by a letter dated June 19, 1964, the Governor authorized the payment of $5,000 to the Peninsula Ports Authority of Virginia "from Item 172 of the 1962 Appropriation Act under the provisions of H. J. R. No. 70, 1958 General Assembly;"

VII.   That the Peninsula Ports Authority entered into a contract dated June 10, 1964, with a firm of consulting engineers for engineering service in connection with the construction of port facilities at Newport News and obligated itself to pay forthwith the sum of $1,000 as a retainer; and

VIII. That the Peninsula Ports Authority of Virginia (Authority), the Chesapeake & Ohio Railway Company (Railway) and the City of Newport News (City) on the same day, June 10, 1964, entered into a tripartite agreement, called a "Memorandum of Agreement," pursuant to which the Authority, the Railway and the City agreed, among other things, to the following:

(a) That the Railway convey to the Authority certain existing port facilities at Newport News, and the Authority pay to the Railway the sum of $7,581,500, representing 55% of the value of the port facility property of $13,784,543, the Railway thereby donating and contributing to the Authority for a public purpose, the difference in amount between the value of the property and the amount paid by the Authority;

(b) That the Authority construct with proceeds derived from the sale of revenue bonds certain new port facilities, including a general cargo pier, presently estimated to cost approximately $26,-000,000;

(c) That the Authority lease to the Railway the facilities to be acquired and those to be constructed by the Authority for an initial period of thirty years, and the Railway pay annual rental during such initial term in an amount "equal to 50% of the total amount the Authority requires to provide for the payment of principal of and interest on, and for the amortization of and reserves for the revenue bonds of the Authority issued to pay the cost of said port facilities, but not in any event to exceed a total annual payment by the Railway to the Authority of $757,500 (called the basic rent) and an additional amount sufficient to pay in full the fees and other costs payable to the trustee, banking institutions and accountants for services under the trust agreement securing the Authority's revenue bonds, * * * and the net loss, if any, suffered in the investment of funds under said trust agreement, and, in addition, the Railway shall also pay all costs of operation, repair and maintenance of the Port Facilities";

(d) That the Railway have the option to renew the lease for two additional successive thirty-year terms, subject to an adjustment of rent; and further that "the Railway operate the property leased as public facilities serving the general public, trucks and other common carriers upon a fair and reasonable basis;"

(e) "That the Authority shall urgently request the General Assembly of Virginia to appropriate to the Authority an amount not

exceeding $757,500 in any fiscal year, equal to 50% of the total amount required for the payment of principal of and interest on, and for amortization of and reserves for, the revenue bonds of the Authority issued to pay the cost of said Port Facilities";

(f) That, "in order to facilitate the issuance and marketing of the revenue bonds of the Authority and for and in consideration of the Authority's agreement to convey to the City, when said revenue bonds have been fully paid or sufficient funds have been deposited for the full payment of such bonds, title to the said port facilities, the City agrees to pay to the Authority an amount equal to the Bond Requirement Deficiency as defined in and pursuant to Section 11 of the Enabling Act," which reads as follows:

"The improvement and development of Port Facilities for the purpose of increasing trade and commerce beneficial to the economy, prosperity and welfare of the State conform to the overall State policy of promoting the development and operation of adequate, modern and efficient seaports and harbors through such aids and other encouragement as may be authorized by the General Assembly. To promote and encourage the acquisition, construction, operation and maintenance of Port Facilities and to enable the Authority to sell its bonds for paying the cost of such Port Facilities, the Authority is authorized to pledge for the payment of such bonds, in addition to other revenues, *moneys from time to time (i) appropriated to or for the use of the Authority by the General Assembly* and available for such purpose and (ii) paid to the *Authority by the City of Newport News or the City of Hampton or both* cities provided in this section. Notwithstanding any charter or statutory provision to the contrary, *the cities of Newport News and Hampton are, or either of them is, authorized to pay to the Authority for each fiscal year during which any of such bonds are outstanding an amount not exceeding the Bond Requirement Deficiency*, as hereinafter defined, *incurred in such fiscal year* and the City of Newport News and the City of Hampton, or either of them, and the *Authority are empowered to enter into any contract or contracts, for such period of years as they determine to be necessary*, providing for such payments and further providing that in *consideration of the assumption by the City of Newport News or the City of Hampton* or both cities, as the case may be, of *such contingent liability to make such payments* the Authority may convey to the respective city or cities, when all bonds of the Authority payable from any revenues of such Port

Facilities, including interest thereon, shall have been paid or sufficient funds for such payment shall have been deposited in trust therefor, title to such Port Facilities of the Authority, *subject to any leasehold interests, licenses, liens or other lawful encumbrances* thereon. The term *'Bond Requirement Deficiency' as used in this act means for any fiscal year an amount equal to one-half of the total amount required for such fiscal year to provide for payment of principal of and interest on,* and for amortization and reserves for, the bonds of the Authority that are issued under this act to pay the cost of such Port Facilities, *less the amount of any funds appropriated by the General Assembly* to or for the use of the Authority for such fiscal year and available for such purpose.

"*Any liability to make any payment assumed by the City of Newport News or the City of Hampton* under any such contract or contracts, *being contingent* upon the existence of a Bond Requirement Deficiency *caused by inadequate appropriations* to or for the use of the Authority by the General Assembly, shall not constitute or create an obligation or an indebtedness *within the meaning of any constitutional, statutory or charter limitations* upon obligations or debts of such city, and the execution of any such contract or contracts by the City of Newport News or the City of Hampton *shall not be deemed to create any obligation or* debt contrary to any such limitations." (Emphasis added.);

(g) That the "principal of and interest on the revenue bonds of the Authority shall be payable solely from the rentals derived by the Authority from the lease of said port facilities, moneys that are made available therefor through appropriations of the General Assembly and through payments, if any, of the amount equal to the Bond Requirement Deficiency by the City";

(h) That the "Memorandum of Agreement" should be considered as "a preliminary, interim instrument to be later superseded and supplemented," as soon as practicable, but in any event on or prior to the date the revenue bonds are delivered and paid for, by "a more definitive and formal contract, * * * ";

IX. That the Authority has presented to the Comptroller its voucher for the payment of $1,000 to its consulting engineers; but the Comptroller has declined to issue a warrant authorizing payment thereof, stating that he entertained doubts respecting the validity of said "Memorandum of Agreement," in that:

(a) The obligation of the City to pay to the Authority an amount

equal to the Bond Requirement Deficiency "creates an obligation or debt in contravention of constitutional, statutory and charter limitations of the City," including particularly Section 127 of the Constitution; and

(b) The provisions in the "Memorandum of Agreement" relating to the lease to be entered into between the Authority, the City and the Railway are invalid, being in violation of Section 185 of the Virginia Constitution, since "the credit of the State and of the City is directly or indirectly granted to or in aid of the Railway."

Attached to the petition are exhibits in support of allegations of the petition and a copy of the "Memorandum of Agreement" containing Section 3.04, which reads as follows:

"It is expected that the Commonwealth of Virginia shall biennially appropriate sufficient funds which, with the basic rent payable by the Railway, will be sufficient to enable the Authority to pay its revenue bonds, including interest. *In order to facilitate the issuance and marketing of the revenue bonds of the Authority* and for and in consideration of the Authority's agreement to convey to the City (when the revenue bonds of the Authority issued to pay the cost of the Port Facilities have been fully paid, both as to principal and interest, or sufficient funds have been deposited for the full payment of such bonds) title to the Port Facilities, subject to any leasehold interests, licenses, liens or other lawful encumbrances, including the lease to and the exercise by the Railway of its option to extend the term of the lease, and further in consideration of the advantages and benefits that will accrue to the City and its inhabitants from the construction and operation of modern and efficient port facilities in the City, the City hereby agrees to pay an amount equal to the Bond Requirement Deficiency to the Authority (or to the trustee under the trust agreement, as required by the Authority) promptly and sufficiently in advance of the time that the funds may be required to permit the timely payment of the Authority's revenue bonds and to meet its other obligations pursuant to the trust agreement securing such bonds. *The obligation of the City hereunder to pay the amount equal to the Bond Requirement Deficiency as herein provided shall be a continuing obligation until the Authority's bonds, with interest, have been paid in full or sufficient funds for such payment have been placed on deposit therefor, and the City hereby waives all notices of default, demands of payment, notices of non-payment and all other notices in connection therewith and such obligation of the*

*City hereunder shall be and continue effective notwithstanding any legal disability of the Commonwealth to make such appropriations or any other factor preventing such appropriations. It is intended that this obligation of the City is to cover and include any and all refundings, renewals or extensions of such revenue bonds, howsoever represented,* which refundings, renewals or extensions may not be effected without notice to or assent by the City. *The City hereby agrees that its obligation hereunder may be enforced by the Authority or by the holder or holders of the Authority's revenue bonds or the trustee under any trust agreement securing such revenue bonds.* The total liability of the City hereunder shall not in any event exceed the total amount of the basic rent payable by the Railway to the Authority under the agreement of lease. *The City's liability hereunder shall not be reduced or impaired by reason of the Authority's failure to take any action with respect to the appropriation by the Commonwealth of moneys for the Commonwealth share.*" (Emphasis added.)

The Comptroller filed a demurrer and answer. In his answer, he advances the same contentions relied on in his refusal to honor the voucher submitted by the Authority. He specifically contends that the Enabling Act, the "Memorandum of Agreement" and the actions contemplated thereunder violate Sections 185 and 127 of the Constitution.

The facts are not in dispute. In addition to those alleged in the petition, evidenced by the exhibits and admitted by the demurrer, the parties stipulated:

" a. That the City of Newport News has not authorized the obligations contemplated by the Memorandum of Agreement by ordinance enacted pursuant to Section 123 of the Constitution and approved by the voters in the procedure provided in Section 127 (b); and

" b. That the charter of the City of Newport News does not authorize a larger percentage of indebtedness than authorized by Section 127 of the Constitution; and

" c. That if it is held by this Court under the Memorandum of Agreement the City would incur at the inception an aggregate indebtedness of $22,725,000 to which the limitations of the City's charter and Section 127 of the Constitution apply, then such aggregate amount, plus the existing indebtedness of the City would exceed its debt limitations; and

" d. That if, however, it is held by this Court that the indebted-

ness incurred by the City under said Memorandum of Agreement is limited to the maximum payable in any one year, $757,500, then the charter and constitutional limitations would not be exceeded."

The controversy arises over the construction to be placed upon the facts. The questions raised present two broad issues as follow:

(1) Whether the Enabling Act and the Memorandum of Agreement are invalid in that each violates Section 185 of the Constitution; and,

(2) Whether Section 11 of the Enabling Act, Memorandum of Agreement or the actions proposed thereunder are invalid and in contravention of Section 127 of the Constitution.

## I

Section 185 of the Constitution, so far as pertinent, reads as follows:

"Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association or corporation, nor shall the State, or any county, city or town subscribe to or become interested in the stock or obligations of any company, association or corporation, for the purpose of aiding in the construction or maintenance of its work; nor shall the State become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work; nor assume any indebtedness of any county, city or town, nor lend its credit to the same; * * *."

The answer to the question, do the Enabling Act and the Memorandum of Agreement violate the above section of the Constitution, is supplied by the two cases of *Harrison* v. *Day* (1959) 200 Va. 764, 107 S. E. 2d 594 and *Harrison* v. *Day* (1961) 202 Va. 967, 121 S. E. 2d 615, each of which dealt with the construction of Section 185 in relation to certain phases in the acquisition, maintenance and operation of port authorities by the Virginia State Ports Authority. Each of the cited cases and the case under review are alike in certain factual respects. Each was instituted by the Attorney General of Virginia against the Comptroller of Virginia to determine the constitutionality of statutes and actions thereunder relating to port facilities. Each involved the purchase of existing port facilities from a railway and a lease-back of completed facilities to a railway. Each expressed hope of receiving subsidized appropriations from the Gen-

eral Assembly. There the likeness of the two former cases to the present case disappears. Substantial and material differences appear in the present case, as will be hereinafter set out.

In both of the former cases, we held that the development of port facilities by a political subdivision of the State was a governmental function exercised for public purposes, and that an appropriation of funds by the State to effect that governmental function did not violate Section 185 of the Constitution. In neither was there any lending of the credit of the State or a city to any person, association or corporation, nor any aid granted, except to the Virginia State Ports Authority, a political subdivision, an arm of the State.

In *Harrison* v. *Day, supra,* 202 Va., we held that the Virginia State Ports Authority could lawfully lease its facilities without destroying the public purpose, since that was only a means to accomplish that purpose; that the fact that in the operation of port facilities as a public function, others might incidentally receive a profit did not destroy the public character of the use or violate the letter or spirit of the "credit clause" of Section 185 of the Constitution; and that a provision in the lease that the Authority "would urgently request the General Assembly" to appropriate funds for paying a part of the cost of the port facilities acquired was a moral obligation only, whereas Section 185 deals with legal obligations. It may be noted that in that case, the Norfolk & Western Railway Company agreed to pay rent for property leased to it by the Authority in an amount sufficient to pay the bonds proposed to be issued, with interest, at maturity.

The substantial and vital features which distinguish the present case from the two former cases include the following:

(1) The injection of the City of Newport News as a contracting party, whereas there was no city involved in the prior case;

(2) The payment by the Chesapeake & Ohio Railway Company over the thirty-year term of the lease of only 50% of the bond debt requirement as contrasted with the payment of 100% required of the Norfolk & Western Railway Company, lessee, in the second ports Authority case;

(3) The positive and continuing obligation of the City of Newport News to pay 50% of the Bond Requirement Deficiency, "notwithstanding any legal disability of the Commonwealth to make such appropriations or any other factor preventing such appropriations;" whereas in the other two cases, neither the State nor any political

subdivision, except the respective Authority involved, assumed any legal obligation whatsoever;

(4) The total obligation assumed by the City of Newport News, payable over a thirty-year period exceeds the limitation on the indebtedness which it may incur, under Section 127 of the Constitution, under Article 2, Chapter 5, Title 15.1 of the Code of Virginia, 1950, as amended, and the Charter of the City of Newport News, enacted in conformity therewith; and

(5) When all bonds issued by the Authority shall have been paid, title to the port facilities may be conveyed to the City of Newport News.

There are material differences between Section 11 of the Enabling Act and the terms of the Memorandum of Agreement. The provisions of the agreement are much broader than those of the Enabling Act. The Enabling Act authorizes the City to enter into a contract with the Authority for a "contingent liability;" whereas the agreement declares that the "obligation" assumed by the City "shall be and continue effective nothwithstanding any legal disability of the Commonwealth to make such appropriations or any other factor preventing such appropriations." The Enabling Act suggests that there may be appropriations available to pay the bonds; while the agreement says that: "It is expected that such appropriations will be made."

Under the Enabling Act, the State does not lend its credit, directly or indirectly, nor does it "assume any indebtedness of any county, city or town or lend its credit to the same," in violation of Section 185. Whether or not the General Assembly will make the appropriations referred to is a matter for the determination of each General Assembly. The fact that such appropriations have been made does not bind, and cannot bind the General Assembly to make appropriations in the future. Under the Memorandum of Agreement, the City does agree to pay money to the Authority to assist the latter in the pursuance of its governmental objectives. Since appropriations by the State for such purposes have been held not to be in violation of Section 185 of the Constitution [*Harrison* v. *Day, supra,* 200 Va., page 775] it follows that appropriations by the City, a political subdivision of the State, would not violate Section 185.

Under the circumstances and in view of our holdings in the cases cited, we are of opinion that the Enabling Act is not repugnant to Section 185 of the Constitution; but that the Memorandum of Agree-

ment is in violation of and contrary to the provisions of the Enabling Act because it exceeds the powers granted in that Act.

## II

■ This brings us to the paramount question: Does the Enabling Act, the Memorandum of Agreement, or the actions contemplated thereunder violate Section 127 of Article VIII of the Constitution?

The pertinent provision of Section 127 reads as follows:

"No city or town shall issue *any bonds or other interest-bearing obligations for any purpose, or in any manner, to an amount which, including existing indebtedness,* shall, at any time, *exceed eighteen per centum of the assessed valuation of the real estate* in the city or town subject to taxation, as shown by the last preceding assessment for taxes: \* \* \*; and provided further, that in determining the limitation of the power of a city or town to incur indebtedness there shall not be included the following classes of indebtedness:

"(a) Certificates of indebtedness, revenue bonds or other obligations issued in anticipation of the collection of the revenues of such city or town for the then current year; provided that such certificates, bonds or other obligations mature within one year from the date of their issue, and be not past due, and do not exceed the revenue for such year:

"(b) Bonds authorized by an ordinance enacted in accordance with section 123, and approved by the affirmative vote of the majority of the qualified voters of the city or town voting upon the question of their issuance, \* \* \*." (Emphasis added.)

The Attorney General argues that the provisions of the above section are not applicable here for the following reasons:

(a) That the bonds in question are not bonds or interest-bearing obligations of the City of Newport News, in that such bonds were issued by the Peninsula Ports Authorty of Virginia, and are enforceable only against the Authority and its revenues;

(b) That the liability of the City is contingent upon the failure of the General Assembly to appropriate funds in a sufficient amount to enable the Authority to pay its bonds and debt service; and

(c) That the agreement does not create an obligation at the outset for the entire amount which the City might be called upon to pay for the thirty-year term; but creates a liability at most only for the amount which the City may be called upon to pay in any single year.

These contentions will be dealt with in the order stated.

(a) The bonds in question are not the bonds of the City of Newport News. They are, however, interest-bearing obligations, and by the express terms of the Memorandum of Agreement, the City agrees, first, to pay an amount equal to the "Bond Requirement Deficiency" to the Authority, and, second, that its "obligation" to pay "shall be a *continuing obligation* until the Authority's bonds, with interest, have been paid" in full, *"notwithstanding the failure of the Authority to receive a grant of funds from any sources."* The "obligation of the City is to cover and include any and all refundings, renewals or extension of such revenue bonds, * * *;" and which "may be enforced by the Authority or by the holder or holders of the bonds or the trustee under any trust agreement securing the bonds;" and *its liability* "shall not be reduced or impaired by reason of the Authority's failure to take any action with respect to the appropriations by the Commonwealth of moneys for the Commonwealth share."* (Emphasis added.)

In *Town of South Hill* v. *Allen,* 177 Va. 154, 12 S. E. 2d 770, 772, in construing the meaning of Section 127*, we said:

"This Constitutional inhibition is a restriction upon the power of the legislature to delegate to municipalities the right to incur debts or obligations contrary to the provisions stated therein. It is apparent from an inspection of the general statutes cited that the legislature has not, in express terms, attempted to pass any general law on the subject contrary to the inhibition, hence we will confine our consideration to the provisions of the Constitution itself.

"The first sentence in the section quoted is clear, explicit and comprehensive. It states: 'No city or town shall issue any bonds or other interest-bearing obligations for any purpose, or in many manner, to an amount which, including existing indebtedness, shall, at any time, exceed eighteen per centum of the assessed valuation * * *.' The language is as comprehensive as human ingenuity could devise. The expression 'no city or town' is sweeping. Not only the specific word 'bonds' is used, but the generic term 'obligations.' This is followed by the phrases, 'for any purpose, or in any manner.' It is stated in one of the briefs that these phrases are 'omnivorous.' * * *" 177 Va., pages 159-160.

---

* The historical background and reason for the adoption of the restrictive provisions in Sections 185 and 127 of the Constitution are stated in *Almond* v. *Day,* 197 Va. 782, 91 S. E. 2d 660, and discussed in some detail in the Proceedings and Debates of the Constitutional Convention of 1901-1902, pages 1897-1898.

\* \* \*

"It was clearly the intention of the framers to afford municipalities protection against undue extravagance by their governing bodies and, at the same time, give them power, with the approval of the electors, to exceed the limitations for the purpose of financing self-liquidating capital improvements.

"The language used is plain and unambiguous. It conveys a clear and definite meaning, indicating the purpose intended. When this is the case, courts are not permitted to interpret that which needs no interpretation, and hence general rules for the construction of either constitutional or statutory provisions of doubtful meaning have no application." 177 Va., pages 163-164.

We think that the words "bonds or other interest-bearing obligations for any purpose, or in any manner," in Section 127 are manifestly connected and interwoven with the idea of obligations, indebtedness, or liabilities, which may directly or indirectly require the obligor or insurer to discharge by the payment of money. It seems clear to us that by the Memorandum of Agreement, the City assumes such an obligation.

(b) We come next to the crux of the case, that is, whether the obligation proposed to be assumed by the City is absolute or contingent. In his reply brief the Attorney General says that the commitment of the City is "positive, absolute and continuing in its terms, but it is nonetheless conditional and contingent upon the availability of funds to the Authority from its own resources and from the anticipated appropriations by the General Assembly."

We agree that the obligation of the City is positive, absolute and continuing in its terms; but we do not agree that the obligation is contingent or conditional.

In common, ordinary and everyday usage and in dictionaries, the word "contingent" is defined to mean: possible but doubtful or uncertain; unpredictable because affected by unforeseen conditions or dependent on something that may or may not occur. The word "absolute" means the opposite of "contingent." It means: free from conditions, limitations or qualifications, not dependent, or modified or affected by circumstances, that is, without any condition or restrictive provisions. An obligation cannot be "absolute" and "contingent" at the same time.

In 17 C. J. S., page 366, "Contingent Debt" is defined as follows:

"The phrase may be employed as referring to an existing demand,

the cause of action upon which depends on a contingency, as distinguished from a demand whose existence depends on a contingency, but *not to include a debt which is certain as to the liability and uncertain only as to the amount. As long as a debt is absolute it is not contingent*, but it is not absolute if its enforceability is dependent on a contingency that may never happen." (Emphasis added.)

Whether an obligation is contingent or not is to be determined by the terms of the provision creating the obligation, and not by a label placed upon it. It is manifest from the provisions of the Enabling Act and from the recitals in the preamble of the Memorandum of Agreement that it was thought bonds of the Authority could not be issued and marketed without the additional security of pledged money from the City. Therefore, "in order to facilitate the issuance and marketing" of its bonds, the City agreed, in consideration of the subsequent conveyance of the properties of Authority to it, to assume the payment of an amount not exceeding the rental paid by the Railway lessee, whether or not the Authority received appropriations from the State or from other sources.

The obligation of the City to the Authority is certain. Its enforceability is not dependent upon uncertain or unpredictable appropriations from the State or other sources. As we have seen, the City agrees to pay the obligation "notwithstanding" the failure of the Authority to receive a grant of funds from any source. Thus, the City assumes the risk involved, not the Authority nor the prospective purchasers of Authority's bonds.

We hold that under the Memorandum of Agreement, the City will become primarily and absolutely liable, and that its liability is not changed by the mode of payment and it is immaterial whether the bonds be paid out of its own revenues or from funds derived from other sources. The City's obligation to pay at all hazards and the possibility that the Authority may receive appropriations from the State do not militate against the fact that the City will directly assume an obligation in excess of constitutional and statutory provisions. For example, the obligation of the City here is like the liability assumed by it in the issue of bonds for public improvements payable by installments in the future. *Jones* v. *Rutherford*, 225 Ky. 773, 10 S. W. 2d 296; *City of Tyndall* v. *Schuurmans*, 74 S. D. 566, 56 N. W. 2d 693.

There is a conflict of authority respecting the above subject, due

to varying facts, the nature of the debt and the laws of the jurisdiction.

Cf. *Walla Walla City* v. *Walla Walla Water Company*, 172 U. S. 1, 43 L. ed. 341, 19 S. Ct. 77.

Having come to the conclusion that the obligation of the City is absolute, it is unnecessary to consider whether a contingent indebtedness should be excluded from the limitation in Section 127 of the Constitution.

(c) It is suggested by the Attorney General that the indebtedness assumed by the City should be limited to the amount payable in any one year, that is $757,500, and thus be within the limitation of the indebtedness prescribed in Section 127.

The Memorandum of Agreement creates a debt at the time the agreement is entered into, a present indebtedness payable in installments running through a period of years. It is not a contract to furnish water, electricity or other public service utilities to the City, the furnishing of which is a condition of the obligation. It is an absolute promise to pay a specific rental for the property which will be conveyed to the City when the full rent has been paid. In other words, it is a present debt, the time of payment being only postponed. There is no distinction between a debt payable presently and one payable by installment in the future, except as to the time of payment. McQuillin, Municipal Corporations, 5th ed. [1950] § 41.37, pages 387-90, and cases cited; *Jones* v. *Rutherford, supra,* 225 Ky.

## III

In his brief, the Comptroller calls our attention to the provision in the second paragraph of Section 11 of the Enabling Act, which reads:

"Any liability to make any payment assumed by the City of Newport News * * * under any such contract or contracts, being contingent upon the existence of a Bond Requirement Deficiency caused by inadequate appropriations to or for the use of the Authority by the General Assembly shall not constitute or create an obligation or an indebtedness within the meaning of any constitutional, statutory or charter limitations upon obligations or debts of such city, and the execution of any such contract or contracts by the city shall not be deemed to create any obligation or debt contrary to any such limitations."

He points out that Section 117 (b) of Article VIII of the Constitution empowers the General Assembly to "provide for the organization and government of cities and towns without regard to, and unaffected by any other provisions of this article, except those of Section One-Hundred and Twenty-four, One-Hundred and Twenty-five * * * One-Hundred and Twenty-six and *One-Hundred and Twenty-seven* of this article, * * *." (Emphasis added.) In this respect the Enabling Act is in conflict with Section 117 (b), because it undertakes to circumvent the limitation concerning the bonded indebtedness of a city imposed by Section 127.

Whether the indebtedness assumed by the City of Newport News is subject to Section 127 must be determined by the language and terms of the contract creating the obligation, and not by a legislative interpretation, however well meant.

We conclude that the obligation which the City proposes to assume under the Memorandum of Agreement is an indebtedness, which, in addition to its existing indebtedness, exceeds its debt limitation under Section 127 of the Constitution, and that the assumption of the proposed obligation is repugnant to Section 127 of the Constitution, the statutes of Virginia, and the Charter of the City.

For the reasons stated, the writ of mandamus prayed for is

*Denied.*