## Staunton

BOARD OF SUPERVISORS OF FAIRFAX COUNTY v. CARLTON C. MASSEY, COUNTY EXECUTIVE OF FAIRFAX COUNTY.

CITY OF FALLS CHURCH v. HARRY E. WELLS, CITY MANAGER OF THE CITY OF FALLS CHURCH.

September 5, 1969.

Record Nos. 7214 and 7215.

Present, All the Justices.

*Harry Frazier, III (Donald C. Stevens,* County Attorney for Fairfax County; *Conrad M. Shumadine; Hunton, Williams, Gay, Powell & Gibson,* on brief), for petitioner in Record No. 7214.

*Harry Frazier, III (LaRue VanMeter;* City Attorney for City of Falls Church; *Conrad M. Shumadine; Hunton, Williams, Gay, Powell & Gibson,* on brief), for petitioner in Record No. 7215.

*Dexter S. Odin (J. William Gilliam; Farley, Odin & Feldman; Gilliam & Sanders,* on brief), for respondent in Record Nos. 7214 and 7215.

*Peter A. Greenburg; John R. Kennedy; Jerome M. Alper; Bernstein, Alper, Schoene & Friedman,* for Washington Metropolitan Area Transit Authority, *amicus curiae* in Record Nos. 7214 and 7215.

I'Anson, J., delivered the opinion of the court.

These cases are before us under the original jurisdiction of the court upon separate petitions for writs of mandamus filed by the Board of Supervisors of Fairfax County (County) and the City of Falls Church (City), petitioners, pursuant to § 17-96, Code of 1950, 1960 Repl. Vol., to compel Carlton C. Massey, County Executive, and Harry E. Wells, City Manager, respondents, to execute on behalf of their respective County and City a contract designated "Transit Service Agreement" (Agreement), to which Washington Metropolitan Area Transit Authority (Authority) and other public bodies of Virginia, Maryland, and the District of Columbia are also parties.

The Authority was created as a body corporate and politic by the Washington Metropolitan Area Transit Authority Compact (Compact), an interstate agreement between Virginia,[1] Maryland,[2] and the District of Columbia,[3] as an agency and instrumentality of each of the signatory parties thereto, to plan, develop, finance, and provide improved transit facilities and service for the Washington Metropolitan Area Transit Zone (Zone). The Zone encompasses the District of Columbia; the counties of Arlington and Fairfax, and the cities of Alexandria, Falls Church and Fairfax in Virginia; and Montgomery and Prince George's counties in Maryland.

In contemplation of the Compact the General Assembly of Virginia adopted the Transportation District Act of 1964 (ch. 631, Acts

---

1. Acts of 1966, ch. 2, p. 5, amending ch. 627, Acts of 1958.
2. Annotated Code of Maryland, 1957, Art. 41, § 317.1, *et seq.*
3. Resolution of Board of Commissioners adopted Nov. 15, 1966.

of 1964, p. 935, codified as §§ 15.1-1342 through 15.1-1372, Code of 1950, 1964 Repl. Vol.). It authorizes the creation of transportation districts to cooperate and participate with an agency such as the Authority in planning and financing an interstate regional transit system. In order to take advantage of this Act, the Northern Virginia Transportation District, consisting of the counties of Arlington and Fairfax and the cities of Alexandria, Fairfax and Falls Church, was created by Chapter 630, Acts of 1964, p. 933.

The Authority has adopted a mass transit plan for the Zone. It proposes to construct a combination subway and surface rapid rail system, 97.7 miles in length, with stations to serve the most densely populated areas of the Zone.

The estimated cost of constructing the transit system is $2,494,-600,000. Funds are to be obtained from the following sources: The Authority will issue tax-exempt gross revenue bonds in the amount of $835,000,000; the federal government will contribute $1,147,-044,000; and political subdivisions in the Zone will contribute the sum of $573,522,000.[4] Of this amount, $149,900,000 will come from political subdivisions in Virginia.[5] The shares of the County and City are $61,900,000 and $800,000, respectively. The County and City have authorized the issuance of general obligation bonds in these amounts, and have entered into a capital contributions agreement with the Authority for the payment of these sums during the estimated ten-year construction period.

Article VII, § 16, of the Compact declares as a policy that, "as far as possible, the payment of all costs shall be borne by the persons using or benefiting from the Authority's facilities and services, and any remaining costs shall be equitably shared among the federal government, the District of Columbia, and the participating local governments in the Zone."

Article VII, § 18(a), of the Compact, and Code § 15.1-1357 (b) (3) of the Transportation Act authorize the County and City to enter into contracts with the Authority to contribute to the capital for construction and/or acquisition of facilities, and for meeting expenses and obligations *in the operation of such facilities*. See also, Code § 15.1-1359, as amended, 1968 Cum. Supp.

The Transit Service Agreement states in its preamble, *inter alia*,

---

4. The total amount exceeds the estimated cost of construction, but this is not unusual.

5. Counties of Arlington and Fairfax, and the cities of Alexandria, Fairfax and Falls Church.

that the Authority's engineering studies estimate that fare box receipts and other transit system revenues will be more than sufficient to pay debt service and reserves on the Authority's transit revenue bonds as well as to meet operating and maintenance expenses, but it is nevertheless considered that the financing of the transit system on favorable terms requires each of the political subdivisions to agree to make payments for services to be provided by such transit systems.

Under the Agreement, the County and City will underwrite their proportionate shares of any deficits incurred in the operating expenses of the transit system by making monthly service payments in advance to the Authority, beginning with the first day of the fiscal year next succeeding the initial operation date and ending June 30, 2040. The Agreement defines "operating deficiency requirement" and "operating expenses" as follows:

"Operating Deficiency Requirement shall mean, for any Fiscal Year, the amount, if any, by which Operating Expenses for such Year exceed the Revenues for such Year remaining after provision is made for the debt service and reserve requirements for such year with respect to Transit Bonds.

"Operating Expenses shall mean all the expenses of operating and maintenance of the Transit System, including but not limited to, renewals and replacement of the facilities of the Transit System and interest on temporary borrowings to meet expenses of operation and maintenance of the Transit System, and payments to reserves for such expenses as may be required by the terms of any contract of the Authority with or for the benefit of the holders of Transit Bonds."

Each year the Authority is required to make a complete review of its financial condition, rate and fare structure, and the procedures, schedules and standards of transit service. On the basis of such data the Authority shall determine the transit service to be provided and the rate and fare structure for the ensuing year. The Authority is also required to determine whether the estimated revenues of the transit system, after making provision for debt service and reserve rquirements for that year on the Authority's transit revenue bonds, will be sufficient to cover the cost of operation and maintenance incurred. The extent to which the revenues are insufficient for this purpose is the "operating deficiency requirement" for the ensuing

year. There is then added to or subtracted from the estimated "operating deficiency requirement" such amounts as are required to adjust for the difference between results of operations for the preceding year. The "operating deficiency requirement" as thus adjusted constitutes the aggregate service payment.

The aggregate service payment is allocated among the political subdivisions in the Zone in accordance with a prescribed formula. The amounts thus allocated constitute the service payment to be made by each political subdivision. The Authority is required to advise each political subdivision of its monthly service payment at least nine months before the beginning of the Authority's fiscal year. After the end of each year an adjustment is made to reflect the obligation of each political subdivision on the basis of the actual operating deficiency. If there is no operating deficiency for a particular year, the service payments are returned.

The obligation of each political subdivision to make its service payment is conditioned upon transit service being rendered to it. If no transit service is rendered in any particular year, no service payment is required for that year. And if the Authority furnishes any political subdivision less than 85 percent of the service, measured in train miles or number of trains, previously determined by the Authority for a particular year, the amount of the service payment is reduced in accordance with the service actually furnished for that year. Service payments shall be applied by the Authority only to the payment of its operating expenses and temporary borrowings to meet operating expenses, and shall not be applied to any other purposes.

Under the financial plan of the Authority, gross revenue derived from the operation of the transit system will be pledged to secure the payment of the principal and interest to the holders of transit bonds in accordance with the terms of the bond indenture. See also § 44 of the Compact.

The questions presented are:

(1) Will the obligations of the County and City under the Agreement constitute debt or indebtedness within the meaning of §§ 115(a) or 127 of the Constitution of Virginia, or §§ 7.03 or 7.06 of the charter of the City of Falls Church?

(2) Will the obligations of the County and City under the Agreement constitute a grant or loan of credit, in violation of § 185 of the Constitution of Virginia?

(3) Does the Agreement comply with the Compact and the Transportation Act of 1964?

## I.

Sections 115(a) and 127 of the Constitution of Virginia are designed to control indebtedness of localities, but each approaches the problem in a different way. Section 115(a) limits county debt by requiring a referendum approved by the qualified voters. Its pertinent language follows:

> "No debt shall be contracted by any county * * * except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county * * * to contract any debt except to meet casual deficits in the revenue, a debt created in anticipation of the collection of the revenue of the said county * * * for the then current year, or to redeem a previous liability, unless in the general law authorizing the same provision be made for the submission to the qualified voters of the proper county * * * for approval or rejection, by a majority vote of the qualified voters voting in an election * * * and such approval shall be a prerequisite to contracting such debt."

Section 127 limits the indebtedness of cities and towns to eighteen percent of local taxable real estate values. Its pertinent provisions follow:

> "No city or town shall issue any bonds or other interest-bearing obligations for any purpose, or in any manner, to an amount which, including existing indebtedness, shall, at any time, exceed eighteen percentum of the assessed valuation of the real estate in the city or town subject to taxation, as shown by the last preceding assessment for taxes * * * and provided further, that in determining the limitation of the power of a city or town to incur indebtedness there shall not be included the following classes of indebtedness:
>
> "(a) Certificates of indebtedness, revenue bonds or other obligations issued in anticipation of the collection of the revenues of such city or town for the then current year; provided that such certificates, bonds or other obligations mature within one year

from the date of their issue, and be not past due, and do not exceed the revenue for such year;

"(b) Bonds authorized by an ordinance enacted in accordance with section one hundred and twenty-three, and approved by the affirmative vote of the majority of the qualified voters of the city or town voting upon the question of their issuance, at the general election next succeeding the enactment of the ordinance, or at a special election held for that purpose for a supply of water or other specific undertaking from which the city or town may derive a revenue * * *."

Section 7.03 of the Falls Church charter applies the limitation of § 127 of the Constitution to the issuance of "bonds and notes." Section 7.06 of the charter prescribes the procedure for the issuance of bonds and requires that bond ordinances be approved by a referendum.

Petitioners recognize that while § 127 refers to "bonds or other interest-bearing obligations," the language includes any unconditional obligation requiring the payment of money and has the same meaning as "debt" as used in § 115(a), and that the Falls Church charter provisions rest upon the same determination. See, *Button v. Day*, 205 Va. 629, 642, 139 S. E. 2d 91, 100 (1964).

Hence the paramount inquiry here is whether by executing the contract designated "Transit Service Agreement" the County and City will incur debts in violation of the constitutional limitations.

Petitioners say that to constitute a debt within the meaning of constitutional limitations, there must be a present obligation; and that since the Agreement requires the County and City to make the service payments when, as, and if transit service is rendered, and then only if available revenues of the transit system are inadequate, this creates nothing more than a contingent liability and not a present indebtedess.

Petitioners rely on the principle that a local government may lawfully contract for necessary services such as water, electricity, or sewerage, over a period of years and agree to pay therefor in periodic installments as the services are furnished. In such cases the amounts to be paid as the services are rendered under such contracts do not give rise to a present indebtedness of such local governments, and such contracts are not rendered invalid by the fact that the aggregate of the installments exceeds the debt limitation. *Walla*

*Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 19, 20, 19 S. Ct. 77, 43 L.ed. 341 (1898); *Struble* v. *Nelson,* 217 Minn. 610, 15 N. W. 2d 101, 104 (1944); 64 C.J.S., Municipal Corporations, § 1852(b), p. 374; 38 Am. Jur., Municipal Corporations, § 463, pp. 144-146; Annotation, 103 A.L.R. 1160, 1161, and the numerous cases there cited.

We do not think, however, that the principle relied on is applicable in the present cases. Our examination of the authorities cited by the petitioners did not reveal a single case in which the local governments underwrote or guaranteed the deficit incurred in the operation of the facilities furnishing the services under their contracts.

Petitioners give much weight to the dictum in *Button, supra,* 205 Va. at 644, 139 S. E. 2d at 101, supporting their contention that where the obligations of the County and City are contingent upon the furnishing of essential services they would not constitute a present debt. There a tripartite agreement between the City of Newport News, the Peninsula Ports Authority of Virginia and the Chesapeake & Ohio Railway Company, which was to lease and operate the port facilities, provided that the authority would "urgently request" the General Assembly to appropriate an amount equal to fifty percent of the annual amortization of the authority's bonds; but, in the absence of such appropriations, the city would pay such amount. We held that by the tripartite agreement the city became primarily obligated for payments on the authority's bonds and a present debt was created, though it was payable in future installments; and that this debt, not authorized by a referendum, would exceed the debt limitation of § 127, thereby making the agreement invalid.

It is true that in *Button* we said: "It is not a contract to furnish water, electricity or other public service utilities to the City, the furnishing of which is a condition of the obligation." This dictum was a mere recognition of the general rule that a continuing service contract, for which the municipality agrees to pay in installments as the service is furnished, does not create a present debt for the aggregate amount of all the installments throughout the term of the contract within the meaning of constitutional limitations of municipal indebtedness. However, it cannot be concluded from the dictum in *Button* that all contracts which are called service agreements are in fact such, irrespective of the provisions contained therein.

Although the County's and City's contract is designated a "Transit Service Agreement," the label placed upon it does not necessarily make it such. The obligations of the County and City under the Agreement are for more than just payments for transit service. They agree to pay that amount by which the "operating expenses" exceed the revenues from the transit system after provision is first made for debt service and reserve requirements for the revenue bonds issued by the Authority. The "operating expenses" include all the expenses of operation, maintenance, renewals and replacement of the facilities of the system, interest on temporary borrowings to meet expenses of operation, and payments to reserves for such expenses as may be required by the terms of any contract of the Authority with or for the benefit of the transit bond holders. The payments to be made by the County and City guarantee the continued operation of the transit system during the life of the contract, which expires June 30, 2040, since the operating revenues are pledged to the payment of the transit bonds. While it is true that the payments required of the County and City do not go directly to the payment of debt service, their obligations to pay the "operating expense" deficit in effect amount to making payments on the Authority's bonds. The obligations of the County and City to underwrite and guarantee an unknown "operating expense" deficit of the transit system are fixed and absolute and constitute a present debt within the meaning of the constitutional limitations on County and City debt or indebtedness.

There are no facts in the record, by stipulation or evidence, to show that the County's obligation under the Agreement can be paid out of current revenues or that there has been an election by the people of the County authorizing the obligation to be incurred. In the case of the City, there is nothing showing the value of its taxable property, or what is the aggregate amount of its indebtedness, or the amount of its constitutional debt limit.

Thus we hold that the obligations of the County and City under the Agreement constitute debt or indebtedness within the meaning of the constitutional prohibitions of §§ 115(a) and 127 and under the charter provisions of the City of Falls Church.

## II.

Respondents say that the Agreement violates the credit clause of § 185 of the Constitution of Virginia in that the County and City

lend their credit to a private contractor who will operate the transit system, to the holders of the transit bonds, and to residents outside the jurisdictional limits of the County and City.

Section 185, so far as pertinent, reads as follows:

> "Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation * * *."

In *Almond* v. *Day*, 197 Va. 782, 790, 91 S. E. 2d 660, 667 (1956), we said: "Whether or not a transaction contravenes the 'credit clause' in § 185 depends upon its animating purpose and the object that it is designed to accomplish."

In *Holston Corp.* v. *Wise County*, 131 Va. 142, 157, 158, 109 S. E. 180, 184 (1921), the county agreed to guarantee payment for crushed stone furnished on credit to any contractor to whom the county might award a contract for road work. We held that the contract or guarantee did not grant the credit of the county to or in aid of any person, association or corporation because the contract was solely for the benefit of the county.

In *Button* v. *Day*, 208 Va. 494, 158 S. E. 2d 735 (1968), the Virginia Industrial Authority was created to guarantee loans to stimulate development of industry, a public purpose, solely through guaranteeing payment of future default of a private debtor with no public ownership involved. We held that since the objective of the Authority was to enable a private firm to obtain loans on public credit when not available on the private firm's credit, it was impermissible under § 185.

Here the publicly conceived, owned and controlled Authority was created under the Compact as an instrumentality and agency of Virginia, Maryland and the District of Columbia to solve the transportation needs of northern Virginia and the entire Washington, D. C., metropolitan area. Courts of other States have recognized that an authority created and vested with power to establish and maintain subway or street railway projects in a large metropolitan area, in the interest of health, safety and public welfare, exercises a governmental function for public purposes. See, *People* v. *Chicago Transit Authority*, 392 Ill. 77, 64 N. E. 2d 4 (1945); *Cleveland* v. *City of Detroit*, 322 Mich. 172, 33 N. W. 2d 747 (1940); *Sun Print-*

*ing and Pub. Ass'n* v. *Mayor of New York,* 152 N. Y. 257, 46 N. E. 499 (1897).

We have held that payments of money by the State and a city to aid an authority in exercising its governmental function do not violate § 185. *Button* v. *Day, supra,* 205 Va. at 639, 139 S. E. 2d at 98; *Harrison* v. *Day,* 200 Va. 764, 775, 107 S. E. 2d 594, 601 (1961).

The mere fact that others might incidentally profit from the operation, financing and use of a facility established by an authority for a public purpose, in the exercise of a governmental function, does not destroy its public purpose. *Harrison* v. *Day,* 202 Va. 967, 972, 973, 121 S. E. 2d 615, 619 (1961); *Development Authority* v. *Coyner,* 207 Va. 351, 357, 150 S. E. 2d 87, 93 (1966); *Almond* v. *Day supra,* 197 Va. at 791, 91 S. E. 2d at 667.

Thus we hold that the Agreement of the County and City does not extend the credit of the County or City "to or in aid of any person, association or corporation" within the letter or spirit of the credit clause of § 185.

## III.

Respondents say that the Agreement does not comply with the Compact and the Transportation Act of 1964 because the Authority is given no right to issue gross revenue bonds. We do not agree. Section 44 of the Compact gives the Authority the right to issue either gross or net revenue bonds.

Having held that the obligations of the County and City under the Agreement constitute debt or indebtedness within the meaning of the constitutional limitations of §§ 115(a) and 127 and under the charter of the City of Falls Church, we deny the writs of mandamus.

*Writs denied.*