485 P.2d 816

**TUCSON TRANSIT AUTHORITY, INC.,**
Petitioner,

v.

**Gary K. NELSON, Attorney General,**
Respondent.

No. 10350.

Supreme Court of Arizona,
In Banc.

June 4, 1971.

Rehearing Denied June 29, 1971.

Gust, Rosenfeld & Divelbess, by Fred W. Rosenfeld, Jane Rex Greer, Phoenix, for petitioner.

Gary K. Nelson, Atty. Gen., by Charles S. Pierson, Asst. Atty. Gen., Ralph E. Willey, Asst. Atty. Gen., Phoenix, for respondent.

UDALL, Justice:

The petitioner, Tucson Transit Authority, Inc., has invoked the original jurisdiction of this Court by filing a petition for special action seeking to compel the Attorney General, as respondent, to execute his approval and certification of a proposed $2,000,000 issuance of Tucson Transit Authority, Inc. Bonds.

The facts surrounding the proposed issuance of the Transit Authority Bonds are as follows: Tucson Transit Authority, Inc., hereinafter referred to as the Transit Authority, was formed pursuant to the Urban Mass Transportation Systems Act. Sections 40–1101 to 40–1147, A.R.S. On July 27, 1970, the City of Tucson, pursuant to A.R.S. § 40–1113, adopted Ordinance No. 3473 declaring that it was "necessary for the preservation of the peace, health, and safety" of the City of Tucson that this ordinance, granting permission to incorporate a transit authority, become effective immediately. A board of directors to the proposed Transit Authority was appointed, and immediately thereafter the Transit Authority was organized and the Articles of Incorporation filed with the Arizona Corporation Commission and the Secretary of State.

On November 18, 1970, the board of directors met and adopted a resolution authorizing the issuance of $2,000,000 principal amount of Tucson Transit Authority, Inc. Bonds. On December 15, 1970, this resolution was submitted to the Attorney General for his approval, but approval was not forthcoming. The Transit Authority, thereupon commenced this Special Action to compel the Attorney General, as respondent, to approve the proceedings relative to the proposed issuance of the Transit Authority's bonds and to certify such bonds in accordance with § 40–1146, A.R.S.

The statutory procedures relative to formation and incorporation of the Transit Authority are not in dispute. Respondent has acknowledged that the Transit Authority was formed and the bonds prepared in accordance with the provisions of the Act. He, nevertheless, has declined to certify the bonds on the grounds that the Act, itself, is unconstitutional. In support of this assertion of unconstitutionality respondent has advanced several arguments. We have considered these arguments and having found that the Act contravenes Article 7, Section 13 of the Arizona Constitution, A.R.S., in that it fails to provide for prior electorate approval of the bonds sought to be issued, we need not indulge in any lengthy discussion of respondent's other contentions. We hold that the bonds sought to be issued are general obligation bonds and are not revenue bonds so as to exempt their issuance from the prior electorate approval requirement of Article 7, Section 13. We also hold that the Transit Authority, being a public service corporation, cannot be exempted from taxation and

must be subject to Corporation Commission control.

Article 7, Section 13, Arizona Constitution reads, in part, as follows:

"§ 13. *Submission of questions upon bond issues or special assessments*

Section 13. Questions upon bond issues or special assessments shall be submitted to the vote of * * * qualified electors of this State, and of the political subdivisions thereof affected by such question."

The prior electorate approval requirement of this section remains unaffected in spite of the recent United States Supreme Court decision in City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), wherein the Supreme Court found Arizona's constitutional and statutory provisions, excluding nonproperty owners from voting in elections for the approval of the issuance of general obligation bonds, to violate the equal protection clause of the Fourteenth Amendment. The Court held that a state may not condition one's right to vote in elections for the approval of general obligation bonds on being a real property owner, since the difference between a property owner's interests and those of a nonproperty owner in the outcome of such elections is not sufficiently substantial to justify exclusion of the latter from the franchise.

■ With regard to Article 7, Section 13 of the Arizona Constitution, the *Kolodziejski* case, involving general obligation bonds, has not abrogated the requirement that bond issuances affecting the political subdivision seeking to issue same must first be submitted to a vote. To this general rule there is one notable exception. It is now well-established that "revenue bonds" are exempt from the constitutional requirement of prior electorate approval where a "special fund" is created into which certain designated funds are to be deposited and from which all expenses are to be paid; providing, however, that the issuing entity does not, in any form whatsoever, assume any liability therefor. The use of the "special fund" method of financing, i. e., "revenue bonds", has been approved by this Court on numerous occasions. City of Globe v. Willis, 16 Ariz. 378, 146 P. 544 (1915); Board of Regents v. Sullivan, 45 Ariz. 245, 42 P.2d 619 (1935); Arizona State Highway Commission v. Nelson, 105 Ariz. 76, 459 P.2d 509 (1969).

■■ The purpose in requiring an election on general obligation bond issuances is to provide the electors of an affected district with a voice in accepting or rejecting a proposed expenditure which they ultimately may bear. Because bond issues in most instances involve the borrowing of large sums of money, the repayment of which is ordinarily projected over a considerable period of time, this Court has held that the creation of an indebtedness to be evidenced by bonds payable not in the immediate future but rather over a considerable number of years should only be with the consent of the qualified electorate of the affected district. Ackerman v. Boyd, 74 Ariz. 77, 244 P.2d 351 (1952). An election is required even though the proposed increase in indebtedness would not violate the political subdivision's constitutional debt limitations. The only exception to this rule requiring prior electorate approval is the special fund method of financing mentioned above and first espoused in City of Globe v. Willis, supra, where we stated our reasons for so holding:

"Bonds issued by a municipality as evidence of its obligations are included within the terms of this provision, as also special assessments for the payment of which it becomes liable, for in both cases the municipality, as such, is 'affected by such question.' But a municipality is not 'affected' by a bond issue or a special assessment when it in no way incurs liability for their payment, even though it be constituted under the law the agency by and through which the bonds are issued or the special assessment, is made. 'Questions upon bond

issues or special assessment'—that is, questions affecting the primary liability of the municipality—must be submitted to the property taxpayers therein, otherwise qualified as electors. Bond issues and special assessments that do not become a direct charge against the municipality, and do not increase its indebtedness, cannot be said to 'affect' it, and are not under this provision of the Constitution to be submitted to a vote as therein prescribed. That the first state Legislature understood section 13, article 7, to mean what we have indicated is clearly shown by its legislation." 16 Ariz. 378 at 382, 146 P. 544 at 545.

Of crucial importance in arriving at this decision was the fact that the Sewer Act specifically provided that the city was to incur no liability, direct or contingent, in issuing the bonds and undertaking the improvement and only the real property benefitted was to bear the cost of all expenditures made for such improvement.

In Guthrie v. City of Mesa, 47 Ariz. 336, 56 P.2d 655 (1936), this Court had occasion to construe the validity of a pledge of gross income to payment of bond principal and interest which made no provision for prior payment of expenses incurred in maintaining and operating the water plant and system. We held that the amount thus pledged would be upheld, although it purported to be a "gross pledge" of revenue, as long as it was taken

"* * * from what remains after the expenses of operation and maintenance are taken care of, that is, from the net income, a result that follows from the direction to the governing body that it shall at all times prescribe rates that will make the utility self-liquidating, namely, pay all operating and maintenance costs and in addition, take care of the bonds and interest thereon as they become due." 47 Ariz. 336 at 346, 56 P.2d 655 at 659.

A gross pledge of all income to the payment of a revenue bond cannot be sanctioned where there are maintenance, operation or other expenses which will have to be provided for by resort to the general credit of the originating entity, i. e., the City of Tucson. In the instant case it is common knowledge that municipal transit systems are financially a losing proposition. That deficits are anticipated is evidenced by the legislature's grant of taxing power to supplement the income of the Transit Authority in covering its expenses. By pledging the taxing power of the district to be served, i. e., the City of Tucson, the legislature has thereby pledged the district's general credit and such pledge necessarily results in a transformation in the nature of the proposed bond issuance from revenue bonds to general obligation bonds; thus subjecting the issuance to the prior electorate approval requirement of Article 7, Section 13.

Such method of funding bonds unquestionably creates an indebtedness on the part of the district serviced by pledging its taxing power. An identical problem was recently brought before the Supreme Court of Appeals of Virginia in Board of Supervisors of Fairfax County v. Massey, 210 Va. 253, 169 S.E.2d 556 (1969). There, the transit authority was created as a body corporate and politic by the Washington Metropolitan Area Transit Authority Compact (Compact), an interstate agreement between Virginia, Maryland and the District of Columbia. In contemplation of the Compact the General Assembly of Virginia enacted legislation (Transportation District Act of 1964, codified as §§ 15.1–1342 through 15.1–1372, Code of 1950, 1964 Repl.Vol.), authorizing the creation of transportation districts to cooperate and participate with the transit authority in planning and financing an interstate regional system.

As completed, the "Agreement" provided, in part, that the transit authority was required to annually make a complete review of its financial situation. It was also required to determine whether the estimated revenues of the transit system, after first having made provision for debt service and reserve requirements for that year on the transit authority's revenue bonds, would

be sufficient to cover the costs of operation and maintenance. Under this financial plan gross income, generated by the transit system, was first to be pledged to the payment of bond principal and interest, with any excess to be applied toward operation and maintenance expenses incurred. Any resulting deficit was to be borne by the city and county serviced by the transit system. When the county executive and city manager refused to execute the contract petitioners instituted proceedings for writs of mandamus to compel execution of the contract. In answer to respondents' argument that such bond issuance would incur debts in violation of Virginia's constitutional debt limitation provisions, petitioner argued that in order to constitute an indebtedness within the meaning of constitutional debt limitations there must be a "present obligation." They asserted that the Agreement required the city and county to pay their share of the deficits only should there be deficits, and since there were as yet no deficits, this would create nothing more than a contingent liability and not a present indebtedness.

■ The Virginia court rejected this argument, holding that the obligations of the county and city under the Agreement constituted a debt or indebtedness within the meaning of constitutional prohibitions:

"Although the County's and City's contract is designated a 'Transit Service Agreement,' the label placed upon it does not necessarily make it such. The obligations of the County and City under the Agreement are for more than just payments for transit service. They agree to pay that amount by which the 'operating expenses' exceed the revenues from the transit system after provision is first made for debt service and reserve requirements for the revenue bonds issued by the Authority. The 'operating expenses' include all the expenses of operation, maintenance, renewals and replacement of the facilities of the system, interest on temporary borrowings to meet expenses of operation, and payments to

reserves for such expenses as may be required by the terms of any contract of the Authority with or for the benefit of the transit bond holders. The payments to be made by the County and City guarantee the continued operation of the transit system during the life of the contract, which expires June 30, 2040, since the operating revenues are pledged to the payment of the transit bonds. *While it is true that the payments required of the County and City do not go directly to the payment of debt service, their obligations to pay the 'operating expense' deficit in effect amount to making payments on the Authority's bonds.* The obligations of the County and City to underwrite and guarantee an unknown 'operating expense' deficit of the transit system are fixed and absolute and constitute a present debt within the meaning of the constitutional limitations on County and City debt or indebtedness.

"There are no facts in the record, by stipulation or evidence, to show that the County's obligation under the Agreement can be paid out of current revenues or that there has been an election by the people of the County authorizing the obligation to be incurred. In the case of the City, there is nothing showing the value of its taxable property, or what is the aggregate amount of its indebtedness, or the amount of its constitutional debt limit." [Emphasis added] 210 Va. 253, 169 S.E.2d 556 at 561.

With this decision we are in complete agreement. The legislature, in the case at bar, seeks to utilize this same method in financing the Tucson Transit Authority. Here, as in *Massey*, supra, "revenue" bonds, so called, are to be financed by pledging the gross income derived from operation of the transit system, leaving any resulting deficits to be borne by the area serviced by the transit system. Clearly, the bonds in both cases create an indebtedness and are general obligation bonds. As such, prior electorate approval is a pre-requisite to issuance.

■ Revenue bonds, on the other hand, generally do not require prior electorate approval; nor are they subject to constitutional debt limitations, since the political subdivision issuing them assumes no liability, actual or potential and is therefore not "affected" by it in any manner. Revenue bonds may be made payable from a special fund supplied with revenue generated by the proprietary project itself, Crawford v. City of Prescott, 52 Ariz. 471, 83 P.2d 789 (1938); with revenues supplied "by voluntary contributions of the state to the city" derived from fees, penalties or excise taxes, already in existence and not created in anticipation of the bond issue, Switzer v. City of Phoenix, 86 Ariz. 121, 341 P.2d 427 (1959); or with revenues supplied from a constitutionally authorized fund, separate and distinct from the state's general revenues, Arizona State Highway Commission v. Nelson, 105 Ariz. 76, 459 P.2d 509 (1969). They may not be supplied from general taxes levied specifically to provide revenue for a proprietary project, such as the Transit Authority, and still retain the status and resulting privileges of revenue bonds.

■ With respect to the case at bar, A.R.S. § 40–1131(A) refers to the proposed bond as a "self-liquidating revenue bond." The legislature has sought to qualify the bond as a revenue bond by providing that it is to be "payable only from revenues [derived] from the operation of the authority and its equipment and facilities." A.R.S. § 40–1131(B) (2). This provision, when viewed alone, is deceiving in that it creates the appearance that the proposed bond is a revenue bond because it is payable exclusively from revenues to be generated by the Transit Authority, and that such revenues will be sufficient to pay all expenses incurred. Yet, when viewed in its proper perspective, i. e., in conjunction with the power of the board of directors to request and obtain a tax levy in the amount requested (A.R.S. § 40–1139), the true character of the bond comes to light. By pledging the general taxing power of the City of Tucson and pledging gross income to payment of bond principal and interest, the legislature effectively transformed this bond into a general obligation bond; thus bringing it within the purview of Article 7, Section 13. An election thereby became a prerequisite to issuance of the bonds. While it may be true that a large portion of the maintenance and operational expenses may be paid from funds generated by the operation of the Transit Authority, the fact remains that the City of Tucson has pledged its taxing power. We must look to the transaction for what it is and not for what it is called. Rodriquez v. Williams, 104 Ariz. 280, 451 P.2d 609 (1969); Goodman v. State, 96 Ariz. 139, 393 P.2d 148 (1964). Merely calling a bond a revenue bond does not make it such. We cannot permit the bond to be issued without compliance with Article 7, Section 13 of our Constitution. Prior electorate approval of this bond is essential.

■ In reference to respondent's other contentions we are inclined to agree with respondent that the Transit Authority, as created, is a "public service corporation" and not a "municipal" or "municipally owned corporation." By constitutional definition "all corporations other than municipal engaged in carrying persons or property for hire * * * shall be deemed public service corporations", Article 15, Section 2 of the Arizona Constitution. Quite clearly, the Transit Authority cannot, by any stretch of one's imagination, be classified as a "municipal corporation". The Transit Authority also cannot be considered to be a "municipally owned corporation since: "title to all property acquired under the provisions of this article shall immediately and by operation of law vest in such transit authority", A.R.S. § 40–1118 (A); the originating municipality, i. e., the City of Tucson, assumes no financial responsibility for any debts incurred by the Transit Authority, A.R.S. § 40–1136; and full power to regulate the Transit Authority is vested in the board of directors of the Transit Authority, A.R.S. § 40–1122.

Being a public service corporation, Article 15, Section 3 of the Arizona Constitu-

tion governs. This section provides that the Corporation Commission shall have "full power" to prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected by public service corporations for services rendered within this state. It also has full power to make reasonable rules, regulations and orders by which such corporations shall be governed in the transaction of business. One exception to this general rule is provided for in Article 15, Section 3: where the legislature specifically authorizes an incorporated city or town to "exercise supervision over public service corporations doing business therein." Such is not the case at bar, however, since the board of directors of the Transit Authority, and not the City of Tucson, was given rate-making and regulatory power over the Transit Authority.

 Also, being a public service corporation, the Transit Authority cannot lawfully be exempted from taxation as § 40-1118, A.R.S., attempts to so provide. Article 9, Section 2, Arizona Constitution, specifically enumerates that property which is to be granted tax exempt status. A tax exemption cannot be implied, Arizona State Tax Commission v. F. Harmonson Company Metal Products, 63 Ariz. 452, 163 P.2d 667 (1945), and laws exempting property from taxation are to be strictly construed; the presumption being against such exemption. City of Phoenix v. Bowles, 65 Ariz. 315, 180 P.2d 222 (1947); Conrad v. Maricopa County, 40 Ariz. 390, 12 P.2d 613 (1932). The Transit Authority fails to fall within any of the enumerated exemptions.

The infirmities mentioned above, as well as the failure to provide for prior electorate approval of the bond issuance as required by Article 7, Section 13 of the Arizona Constitution require us to deny petitioner's request for relief seeking to compel the Attorney General to execute his approval and certification of the proposed issuance of Tucson Transit Authority, Inc. Bonds. The Attorney General properly refused to approve and certify the proposed issuance of Tucson Transit Authority, Inc. Bonds.

Petition for Relief Denied.

STRUCKMEYER, C. J., HAYS, V. C. J., and LOCKWOOD and CAMERON, JJ., concur.