# BALENSON *v.* MARYLAND AIRPORT AUTHORITY, ET AL.

[No. 374, September Term, 1968.]

*Per Curiam Order filed April 8, 1969, opinion filed May 9, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*E. Stephen Derby* and *Charles C. G. Evans* for appellant.

*Morton L. Goldner, Special Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* for appellee Mayor and City Council of Baltimore.

*S. Leonard Rottman, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellees Maryland Airport Authority and Board of Public Works.

Amicus curiae brief filed by Samuel D. Shapiro (*Leonard J. Kerpelman* on the brief).

Amicus curiae brief filed by Greater Baltimore Committee, Inc. (*Benjamin C. Howard, Daniel B. Leonard* and *Miles & Stockbridge* on the brief).

SINGLEY, J., delivered the opinion of the Court.

The Circuit Court for Anne Arundel County dismissed a bill of complaint for declaratory relief and for a permanent injunction filed by Balenson against the Maryland Airport Authority (the Authority), Maryland's Board of Public Works (the

State Board) and the Mayor and City Council of Baltimore (the City) which sought among other relief prayed to have subsection 7 of § 1 of Ch. 451 of the Laws of 1968, codified in Maryland Code (1957, 1968 Repl. Vol., 1968 Supp.) Art. 62C § 7, (the Act), declared unconstitutional, null and void; to enjoin the Authority from purchasing Friendship International Airport (Friendship) pursuant to § 7(a) of the Act, and to enjoin the State Board from making any payment to the City under § 7(c) of the Act in connection with the purchase of Friendship.

By a per curiam order entered on 8 April 1969, we reversed with costs the lower court's dismissal of the complaint. Our reasons for so doing follow.

The City built Friendship after World War II on some 3,300 acres which it had acquired in northern Anne Arundel County. It is owned by the City and operated by the City's Airport Board. At 30 June 1968, the facility represented a total capital investment, before depreciation, of $31,977,329, of which $23,928,893 had been contributed by the City, the balance having been provided from State and federal funds. During twenty-one years of operation, Friendship has accumulated operating losses totalling $12,733,282, after making provision for the payment of interest on and the repayment of the principal of the City's outstanding airport bonds as they matured, but before depreciation. The fiscal year ended 30 June 1968 was the first year in which Friendship showed a profit, which for that year amounted to $216,744. It was stipulated below that 2,695,475 passengers used Friendship in the 12 months ended 30 June 1968.

On 27 November 1967, the Legislative Council, after reciting (a) that the Council, through its Budget and Finance Committee, had studied the question of State ownership of Friendship; (b) that there had been unanimous expression of approval of State ownership by various representatives of the City and by other interested parties; (c) that the Council also endorsed the principle of State ownership of Friendship; (d) that "[i]t is necessary now to determine the method by which the State shall operate [Friendship] as well as the purchase price to be paid to the City * * *", and (e) that it was the consensus of the Council that a representative committee should be

appointed to prepare a plan implementing early State owner-
ship of Friendship, adopted a resolution calling for the appoint-
ment of a Committee of twelve members, three to be appointed
by the Governor, three by the Mayor and six by the President
of the Legislative Council. The Committee, which was charged
with the responsibility of immediately "preparing a plan for
State ownership of Friendship * * *, with the plan to include
an agreed purchase price to be paid by the State to the City
* * * and the legislation to implement State ownership" of
Friendship, was to report to the General Assembly by 1 Feb-
ruary 1968.

The Committee report found:

"1. That the City of Baltimore cannot conveniently
provide the necessary large capital funds [1] required
immediately to meet urgent improvement pro-
grams at Friendship International Airport in order
to meet the needs of air-carrier service to the State.
2. That the State can better provide the improved
highway system required to serve the Airport.
3. That the State is in a better position to join with
other agencies in providing high-speed ground
transportation to and from the Airport.
4. That the State can better provide satellite airports
for non-air carrier operations at the rapidly ap-
proaching time when this activity must be removed
from Friendship.
5. The fact that the passenger traffic at Friendship is
but approximately 20% from the City and 80% from
other areas of the State and elsewhere.
6. The fact that the service to residents and businesses
in at least 12 Maryland counties which generate the
majority of the air passengers at Friendship will suf-
fer if the City cannot make timely and adequate
provision for meeting the growing needs at the Air-
port."

The Committee in its report to the General Assembly recom-

---

1. The Committee estimated that it was a capital improvement
program costing not less than $60,000,000, to be completed by 1973.

mended that the State acquire Friendship on the following terms: (1) "[t]he State grant the City * * * $22 million in five equal installments"; (2) "[t]he State will assume the obligation for the outstanding 7th Airport Serial Loan Bonds of the City in the amount of $3,700,000"; and (3) "* * * [t]he State will agree to reimburse the City * * * up to * * * $4 million * * *" for current capital expenditures. To the report was attached a draft of the Act.

The Act was introduced and passed at the 1968 session of the General Assembly and by its terms took effect on 1 July 1968. It provided for the creation of the Authority; empowered it to acquire, construct, maintain and operate airports within the State; and to issue revenue bonds. § 7 of the Act incorporated the substance of the Committee's recommendations, except that it called for payment in four rather than five annual installments:

"(a) The Authority shall purchase, and the Mayor and City Council of Baltimore shall sell to the Authority for the sum of twenty-two million dollars, any and all of the right, title and interest which the Mayor and City Council of Baltimore has in the airport facilities known as Friendship International Airport upon the following terms and conditions:

(1) The Mayor and City Council of Baltimore shall convey by lawful instrument all land and improvements comprising Friendship International Airport to the Maryland Airport Authority.

(2) All outstanding bonds in the amount of three million seven hundred thousand dollars ($3,700,000) resulting from the seventh bond issue, known as the Seventh Airport Serial Loan Issue by the City of Baltimore in connection with the past development and operations of Friendship International Airport, and all interest payable in connection with these bonds shall be paid by the City of Baltimore and reimbursed by the Authority on an annual basis.

(3) Until the date of transfer hereinbefore mentioned, the City of Baltimore shall continue the current

capital improvements programs in progress by utilizing authorized unexpended State and federal grants together with funds of the City of Baltimore. It is understood that these improvements programs are those financed or to be financed by the City of Baltimore airport serial loans identified as Airport Serial Loans Seven and Eight. It is further understood that the City of Baltimore will not issue the Eighth Airport Serial Loan in the amount of four million dollars ($4,000,-000). The Authority shall reimburse the City of Baltimore for the aforementioned expenditures under this section, in an amount not to exceed a maximum of four million dollars ($4,000,000.). It is the intent of the State to make the city whole for capital improvements.

(4) The current operating revenue of Friendship International Airport from July 1, 1968, shall remain in an airport account, which will be designated as a special airport fund account, from which operating expenses will be paid and the balance turned over to the Authority upon transfer of the airport by the City to the Authority as provided in this section.

(b) The purchase price of twenty-two million dollars ($22,000,000) shall be paid to the City of Baltimore in four (4) equal payments. The first payment in the amount of five million five hundred thousand dollars ($5,500,000.) shall become due on the date of transfer of deed to Friendship International Airport from the Mayor and City Council of Baltimore to the Authority, and thereafter payment shall be made in three (3) annual payments.

(c) Payment of funds to the City of Baltimore shall be made by the Board of Public Works upon their determination that the conditions set forth in subsection (a) of this section have been fulfilled. (1968, ch. 451, § 1.)"

The Act also required the State to reimburse the City for its contributions to the City pension system on behalf of Friend-

ship fire-fighting and police personnel who might elect to remain members of the pension system after 1 July 1968.

At the same legislative session there was enacted Ch. 449 of the Laws of 1968, which authorized the State to issue $20,000,-000 of general obligation bonds "* * * for the purpose of providing the payment on account on the purchase of Friendship * * * for organizational expense of creating the Maryland Airport Authority, * * *" for payment of present bonded indebtedness, and other necessary and incidental expenses.

On 1 July 1968, the day when the Act became effective, an ordinance authorizing the City's sale of Friendship on the terms and conditions set forth in the Act was introduced in the Baltimore City Council and referred to the Committee of the Whole. The ordinance authorizing the sale was passed on 12 July 1968, and approved on 16 July 1968 as Ordinance 232. On 14 August 1968, the City's Board of Estimates adopted a resolution ratifying the sale of Friendship, described in the resolution as "no longer needed by the City for public use", in accordance with the provisions of Ordinance 232, *i.e.,* the terms and conditions prescribed in § 7 of the Act.

On 30 August 1968, Dr. Balenson brought the taxpayer's suit [2] in which he challenged the constitutionality of § 7 of the Act and the validity of the City's Ordinance 232. Under our view that § 7 of the Act is invalid because it failed to observe the mandate of Maryland Constitution, Art. III, § 34, we do not reach the other points made by the appellant.

Constitution, Art. III, § 34 provides:

> "No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; and the taxes laid for this purpose shall not be

---

2. The Balenson case was consolidated below with a companion case instituted on 23 July by Samuel Shapiro. Only the Balenson case is before us in this appeal.

repeated or applied to any other object until the said debt and interest thereon shall be fully discharged. * * *"

In *Birmingham v. Bd. of Public Works,* 249 Md. 443, 239 A. 2d 923 (1968), we found Ch. 652 of the Laws of 1966 (the Nursing Home Loan Act of 1966) invalid because the phrase "necessary to produce revenue to meet all interest and principal" payable on the bonds to be issued was inadvertently omitted from the provision for the imposition of the annual tax, and held that we were powerless to correct the omission.

The historical reason for the constitutional safeguards which have governed the creation of State debt for more than a hundred years has been considered at length in *Johns Hopkins University v. Williams,* 199 Md. 382, 86 A. 2d 892 (1952) and in *Maryland Industrial Development Financing Authority v. Meadow-Croft,* 243 Md. 515, 221 A. 2d 632 (1966) and need not be repeated here. It should be pointed out, however, that by enacting the Act, the Legislature created three distinct obligations: § 7 (b) required the payment of a purchase price of $22,000,000 in four annual installments of $5,500,000 each; § 7 (a) (2) required the Airport Authority to reimburse the City for all principal and interest payments on $3,700,000 Seventh Airport Serial Loan Bonds, which mature serially until 30 June 1980; and finally, § 7 (a) (3) required the Authority to reimburse the City for expenditures made in support of a capital improvement program, not to exceed $4,000,000 in the aggregate. The majority rule is that such a purchase gives rise to a debt in the amount of the payments to be made at future dates. 2 Antieau, *Municipal Corporation Law* (1968) § 15.36 at 433; *Walla Walla City v. Walla Walla Water Co.,* 172 U. S. 1, 19 S. Ct. 77, 43 L. Ed. 341 (1898). *Compare,* however, *Hall v. Mayor & City Council of Balto.,* 252 Md. 416, 250 A. 2d 233 (1969), where rentals payable by Baltimore City under a long-term lease were held not to constitute a debt, and see *Wyatt v. State Roads Comm'n,* 175 Md. 258, 267-68, 1 A. 2d 619 (1938).

But, says the State, the Act does not make it clear who is to make the payments and it must be assumed that such payments are not an obligation assumed by the State, but are to be

made by the Authority, presumably from airport revenues collected by the Authority. Such a holding, the State argues, would be consistent with this Court's obligation so to interpret an act as to uphold its constitutionality, citing *Johns Hopkins University v. Williams, supra,* and our duty to give effect to the statute according to the intention of the legislative body, relying on *Stephens v. Montgomery County Council,* 248 Md. 256, 235 A. 2d 701 (1967); *State Dept. of Assessments & Taxation v. Ellicott-Brandt, Inc.,* 237 Md. 328, 206 A. 2d 131 (1965). While these principles are frequently invoked in aid of statutory construction, we have consistently held that courts cannot invade a function vested solely in the legislature, however plausible may be the conjecture that a matter was within the legislative purview. *Birmingham v. Bd. of Public Works, supra,* citing *Redwood v. Lane,* 194 Md. 91, 69 A. 2d 907 (1949); *Rogan v. B. & O. R. R. Co.,* 188 Md. 44, 52 A. 2d 261 (1947); *State Tax Comm'n v. Potomac Elec. Power Co.,* 182 Md. 111, 32 A. 2d 382 (1943); and *Hammond v. Haines,* 25 Md. 541, 90 Am. Dec. 77 (1866).

It is interesting to note that the City contends that the Act *does* obligate the State to make the payments, and that if the State is not so obligated, then "the entire transaction must fall." Of even greater significance is the fact that Ch. 449 of the Laws of 1968 authorized the State to create an obligation of $20,-000,000 for "* * * the purpose of providing *payment on account* on the purchase of Friendship * * *" (emphasis supplied) and that Senate Bill 179, introduced at the 1969 legislative session, authorized the State to issue $16,500,000 of general obligation bonds to "be used for payment of the *balance due* for the purchase of Friendship Airport" (emphasis supplied), *i.e.,* the three annual payments of $5,500,000 each due in the State's fiscal years ending 30 June 1970, 1971 and 1972. This would seem to indicate that by 1969, at least, the Legislature thought that the State had obligated itself to pay the purchase price.

The Greater Baltimore Committee, which filed an amicus curiae brief, would have us hold that Senate Bill 179, if signed by the Governor, would make the constitutional issue moot. But this overlooks the constitutional requirement that the "debt shall

be authorized by a law providing for the collection of an annual tax * * * sufficient to pay the interest * * * and also to discharge the principal * * *." As we see it, the tax must be provided for in the bill which authorizes the debt. See *McKeldin v. Steedman*, 203 Md. 89, 98 A. 2d 561 (1953). The Act created an indebtedness of almost $30,000,000. Ch. 449, a separate bill adopted contemporaneously, authorized an issue of $20,-000,000 of general obligation bonds, only a part of which would have been available for the purchase of Friendship, and it was not until a year later that Senate Bill 179 authorized an additional $16,500,000.

It follows that the court below was in error when it failed to enter a declaration that § 7 of the Act was unconstitutional and invalid, and when it failed to grant the injunctive relief prayed. It was on this account that the order dismissing the bill was reversed.