228

WILLIAM HOLSTER, SUBSTITUTED PLAINTIFF, v. THE BOARD OF TRUSTEES OF THE PASSAIC COUNTY COLLEGE, ROBERT S. ZIMMER, THE BOARD OF SCHOOL ESTIMATE OF THE PASSAIC COUNTY COLLEGE, THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF PASSAIC, RALPH A. DUNGAN, JOSEPH M. McCRANE, JR. AND GEORGE F. KUGLER, JR., DEFENDANTS, AND CITY OF PATERSON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-INTERVENOR.

Superior Court of New Jersey
Law Division

Decided March 22, 1971.

*Mr. Arthur J. Sullivan, Jr.* for plaintiff.

*Mr. Victor Librizzi, Jr.,* Deputy Attorney General, for defendants George F. Kugler, Jr., Joseph M. McCrane, Jr. and Ralph A. Dungan (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

GORDON H. BROWN, J. S. C. By the amended complaint substituted plaintiff William Holster alleges that *chapter* 12 of the *Laws* of 1971, approved and effective on January 28, 1971, violates Art. VIII, § II, par. 3 of our 1947 State Constitution which provides in pertinent part:

The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay

and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.

The original plaintiff here was the City of Clifton with a complaint in lieu of prerogative writs setting up five counts. The first four were disposed of in the course of a hearing held on the return date of Clifton's order to show cause. It is the fifth count which raises the subject constitutional issue and only defendants Ralph A. Dungan, Joseph M. McCrane, Jr. and George F. Kugler, Jr. are involved in it. Legal argument on February 25, 1971 was precipitated by the State's motion for summary judgment to sustain the statute, in which motion the City of Paterson, as intervenor, joined. The relief demanded by the order to show cause implies a reciprocal summary judgment motion to invalidate the act.

The legislative arrangement under attack enables the State to offer capital "support" for county college projects, in the context of *N. J. S. A.* 18A:64A–22, by authorizing the issuance of county bonds in predetermined amounts and by appropriating the money required to pay interest and principal thereon.

Plaintiff contends that by such participation in the county college program the State will undertake a "debt" or "liability," with the result that *chapter* 12 contravenes the cited constitutional provision by which a public referendum is required. The State takes the stand that this financial aid is permissible without approval by the electorate because it is to be tendered in "annual appropriations," thus making its action only voluntary. Put the other way around — no compulsion pushes the State into the position of being an obligor to any degree because no "debt" or "liability" as to it has been created.

It is undisputed that if the effect of *chapter* 12 is to create a State "debt" or "liability," the statute is unconstitutional.

Each side finds material for argument in the same body of decisional law. The following authorities govern the issue according to the briefs which have been submitted: *Wilson, Atty.-Gen., v. State Water Sup. Co.*, 84 N. J. Eq. 150 (E. & A. 1915); *New Jersey Turnpike Authority v. Parsons*, 3 N. J. 235 (1949); *Behnke v. New Jersey Highway Authority*, 13 N. J. 14 (1953); *McCutcheon v. State Building Authority*, 13 N. J. 46 (1963); *Passaic v. Consolidated Police, etc., Pension Fund Comm'n*, 18 N. J. 137 (1955); *State v. Lanza*, 27 N. J. 516 (1958), and *Clayton v. Kervick*, 52 N. J. 138 (1968). The court has been unable to find additional New Jersey material in point. At this level, then, the rationale for decision is to be derived from these sources.

The aim which the constitutional debt limit was meant to promote must be kept in mind. It should serve as a standard for determining analytical relevance. According to the court in *Wilson, supra*:

> * * * the object of the framers [Constitution of 1844] was to prohibit the issue of state bonds or similar obligations, failure to pay which might expose the state to the reproach of repudiation under which some of our sister states then suffered. [84 N. J. Eq. at 163]

But a somewhat different objective has also been stated. In *New Jersey Turnpike, supra*, where it was held that the bonds in question were the debts of an entity independent of the State, there was reference to a theory that would free the bonds of constitutional control even if they were the direct obligations of the *government*:

> This assertion is based on the Special Fund Rule, the theory of which is that the purpose of a debt limitation in a constitution is to protect the people of the state from the exercise of the taxing power to pay obligations of the state, and therefore such a constitutional provision is not impinged upon by bonds that are payable solely from the revenues of the project to be built with the proceeds of the bonds. [3 N. J. at 246]

The court went on to say that there was no need to consider the doctrine in the case at hand because the bonds were

issued by the autonomous Authority. But in the *Clayton opinion, supra,* 52 *N. J.* at 149, it was noted that where bonds are payable solely from "a self-liquidating enterprise such as the Turnpike," many jurisdictions have invoked the "special fund" doctrine in order to hold that such financing does not run counter to the purposes underlying the debt limitation clause.

The so-called special fund rule thus makes validity correlate with and turn upon the risk of taxation. What seems to be central in it is not simply whether there is a "debt" or "liability" but whether or not there is a source of payment independent of the State Treasury.

One finds a factor like that figuring throughout the decisions dealing with the debt limit problem. Indeed even in *Behnke, supra,* where the State had expressly guaranteed the Parkway bonds (to be paid from tolls) and had secured referendum validation in compliance with the Constitution, the court felt obliged to add to its approval the following gratuitous advice:

> * * * we would suggest the danger to the State's credit and solvency inherent in the unrestrained accumulation of state liability on the assumption that all such projects will be and remain self-supporting. [13 *N. J.* at 30]

In *Wilson,* defendant commission, a state agency, contracted to buy land for $1,000,000. The transaction was secured by a mortgage with bonds to be paid by what might be appropriated by the Legislature "from time to time." It was the holding of the majority that this produced a constitutional type "debt" and that it was chargeable against the State. The dissent viewed the debt itself as being one not contemplated by the prohibition:

> The plan avoids the evils which the constitutional provision was designed to meet, since the specific property acquired must be worth what is paid for it, or the owners would not sell on such favorable terms to the purchaser, and the public can at most lose no more than the specific property. The burden of taxation is not increased. [84 *N. J. Eq.* at 163]

In *Clayton* the court made this comment on the *Wilson* result:

> Though its [the Commission's] undertaking expressly stipulated that the bondholders would have recourse only to the mortgaged property, the majority found the bonds to be debts of the State within the meaning of the Constitution. [52 *N. J.* at 147]

It was on an issue as to the quantum of financial risk to which the State was exposed that the court found one ground for division in *McCutcheon, supra*. In that case there was under review a statute creating the defendant Authority to acquire office space for lease to the State. Funding bonds were to be paid out of rent receipts. On its part the State agreed to provide annual budget appropriations for current rents.

The majority saw the arrangement as really one for purchase of the properties by bonds to be financed with annual appropriations in the guise of rent amounts. According to the minority there was no more involved than the application of good prevailing business practices with an unobjectionable annual rental feature.

But in the course of exposition each side took a taxation risk factor into account. It was a significant element in the judgment of the majority:

> Here, unlike those that have gone before, the subject of the Authority's domain is not a toll or self-sufficient facility; the Authority is obliged to lease its building facilities to the State or its departments, agencies, or instrumentalities, and the State Treasury is the sole source of its revenue, in the form of legislative appropriations utilized for the payment of an agreed "rental" in amount adequate to defray the Authority's operating expenses and service and effect the ultimate retirement of the bonds. Thus, the Authority is non-revenue producing; it is an instrumentality of the state whose function is wholly dependent upon state moneys raised by taxation. [13 *N. J.* at 62]

The countering attitude in dissent was that since leasing was the inherent nature of the legislative plan, the State's

obligation at most would be to pay for current yearly occupancy with funds from contemporaneous appropriations "without incurring any new state bonded indebtedness or imposing any new taxes * * *." *Id.* at 78.

It should be noted that the split in the court centered in the purchase-lease issue. On that level the two dissenting justices were only saying that a lease does not create an immediate liability in the aggregate amount of all of the future rents during the term. They did not quarrel with the principle in the prevailing opinion that there is constitutional invalidity where an

Authority is non-revenue producing; * * * an instrumentality of the state whose function is wholly dependent upon state moneys raised by taxation. [At 62]

Justice Hall in *Clayton* described the "general holding" of *McCutcheon* to be "sound law" and he articulated it as having declared the following proposition:

* * * the debt limitation provision is violated (assuming the amount involved is sufficient) where the revenue to pay for state governmental (or for that matter, educational) buildings furnished through an authority, and thus to satisfy that authority's obligations, must and will come, in reality, only from state appropriations. [52 *N. J.* at 158]

Tax risk was certainly a dominant element in formulation of the *Clayton* decision. There the court was called upon to decide whether the bonds of the New Jersey Educational Facilities Authority would constitute "debts" or "liabilities" of the State. The trial judge had determined that they were neither. According to the opinion, "he stressed that, unlike the situation in *McCutcheon*, the facilities here were 'meant to pay their way' from revenues obtained mainly from sources other than the State Legislature." 52 *N. J.*, at 144. In affirming, the Supreme Court itself stressed what might be called a tax risk factor. It felt that the Authority in question stood "on even firmer ground" than the Building Authority in *McCutcheon* because, as to the one before the court,

* * * the annual rentals on its leases with the participating public and private educational institutions were intended to come mainly from sources unrelated to legislative appropriations. With that in mind, its operations may be compared favorably to the many self-liquidating projects which have been sustained in our State * * * and elsewhere. [52 *N. J.* at 154]

That consideration was underlined by Justice Hall in the part of his separate opinion where he said:

I agree with the majority that the constitutional debt limitation provision * * * is not violated by the act, because it is clear enough that no state appropriations or moneys will be required or can be compelled to be provided to enable the Authority to pay its obligations. [at 158]

■ By deductive reasoning one can derive a principle from these decisions to the following effect: if it is probable that a project, attributed to state auspices, will be financed without recourse to taxation, there is no debt limitation imposed by the Constitution. Such a rule of law seems to be implied in all the factual diversity and complexity and throughout the legal reasoning in *Wilson* (dissent), *New Jersey Turnpike*, *McCutcheon* (majority and dissent) and *Clayton*. And it serves the policy of tolerating social innovations, the need for which was pointed up by the court in *Clayton*:

* * * the Constitution "must be construed to the end that public progress and development will not be stifled and that public problems, with their ever increasing complexity, may be met and solved to the best interests of the public generally." [52 *N. J.* at 153]

It leaves "some play * * * for the joints of the [constitutional] machine," as advocated in what the *McCutcheon* dissenters called "the famous quotation" from Justice Holmes. 13 *N. J.* at 79.

*Chapter* 12, now in controversy, provides a potential of $40,000,000 "to satisfy the State's share of capital projects for county colleges pursuant to *N. J. S.* 18A:64A–22" when-

ever existing state funds are insufficient. Section 1. The board of higher education is empowered to determine the need for the "additional State support" as to a particular project. Upon certification of the same to the State Treasurer the latter is to determine the remaining amount of bonds "entitled to the benefits of this act" and then to decide whether additional support is "necessary or advisable." If he so determines then he certifies to the affected board of chosen freeholders "the amount of bonds which shall be entitled to the benefits of this act." Section 2.

At any time within one year after the certification, the freeholders are "authorized" to issue bonds up to that amount providing there is compliance with the interest rate "specified" by the State Treasurer and with the maturity schedule for repayment he has "approved." Section 3.

Within ten days after issuance of the bonds, the county is to certify "the exact amounts payable on account of interest and principal" and "the dates upon which such amounts are payable by the county." Thereafter

* * * The amounts so certified by the county treasurer to the State Treasurer shall be appropriated and paid to the county on or before the dates of each payment by the county on such bonds or notes in an amount with respect to each such date equal to the amount payable on such date and shall be used by the county only for such payment. [Section 6]

There is thus no doubt that the full $40,000,000 — all of the "State's share" of "support" — will originate in appropriations by the Legislature out of general taxation.

The principle distilled from the cited cases is that no constitutional debt limitation is operative where a project attributed to state auspices will probably be financed without recourse to taxation. Inasmuch as the plan set up by *chapter 12* must be funded with tax money, there is nothing to be found in what those courts said to validate it.

Indeed *New Jersey Turnpike* and *Behnke* are inapt as precedents of any kind because in the former there was no appropriation by the State and in the latter the consti-

tutional conditions were fulfilled. As for *McCutcheon,* the spirit of the majority opinion is hostile because the court there condemned "the State's promise to supply * * * sufficient money to liquidate the bonds, available only through the medium of annual appropriations." 13 *N. J.* at 57. And in *Clayton* the court disagreed with the *McCutcheon* analysis, saying that the bonds were *not* payable from general taxation (52 *N. J.* at 149) — thus implying that if such were the case it would be bad — and saying, further, that the arrangement under review in the *Clayton* case was unobjectionable because the money for paying the bonds would "come mainly from sources unrelated to legislative appropriations." 52 *N. J.* at 154.

The scheme of *chapter* 12 of the Laws of 1971 joins the State to the payment of bonds from annual appropriations. With the exception of *Wilson,* which is adverse, no decisional law cited in the Attorney General's briefs deals with such a situation. It appears to be unprecedented in this jurisdiction. Justification for the device is seen, however, in the language of the statute which makes the county the obligor of the bonds and which specifically disclaims any obligation incumbent on the State:

Bonds or notes issued under the provisions of this act shall not be deemed to constitute a debt or liability of the State or a pledge of the faith and credit of the State but are dependent for repayment upon appropriations provided by law from time to time. [Section 8]

With the State thus made immune by the design of the statute and the express disclaimer, it is argued, "state aid, payable out of annual appropriations, is a voluntary and uncompellable gratuity which does not constitute a debt of the State." The brief cites *Wilson, supra; Passaic v. Consolidated Police, etc., Pension Fund Comm'n, supra,* 18 *N. J.* 137 (1955), and *State v. Lanza, supra,* 27 *N. J.* 516 (1958), in support.

It is necessary first to reject the contention that the disclaimer puts the statute, as is said, "outside the ambit of

the constitutional provisions in question." Not so. Transactions are not legally classified and sorted out according to contemporaneous labels. The over-all and inherent nature of what is happening must govern. The State's role ought to be viewed in terms of its full relationship to the establishment and operation of county colleges as outlined by *N. J. S. A.* 18A:64A-1, *et seq.,* as to which *chapter* 12 of the *Laws* of 1971 is a supplement.

At the very inception of a proposal to establish a county college, the State enters the picture. A petition by the board of chosen freeholders initiates the college project but the next threshold step must be taken by the State Board of Higher Education. It acts by first referring the petition to the Chancellor for his "independent study," to include the question "whether the county * * * could, with the state aid provided for in this chapter, financially support such college." *N. J. S. A.* 18A:64A-2.

Next, the Board is to study the Chancellor's report so that it can itself determine, among other things, "whether the county * * * [has] the financial capacity to support such college."

The Board of Higher Education is required to find that establishment and maintenance are "financially feasible" before the enterprise can proceed on the county level. *N. J. S. A.* 18A:64A-2, supra. The "state aid" so referred to is obtained through the administrative mechanism of *N. J. S. A.* 18A:64A-22 whereby the college can receive "state support" for up to one half of the cost of capital projects and additional money measured by a formula for operational expense.

In light of these provisions of the basic enabling act, to which *chapter* 12 is but an appendage, and the resulting potential for radical fiscal action at the county level in reliance thereon, there is considerable attenuation of the State's power to act unilaterally in turning a "gratuity" on or off. An issue develops which relates not so much to any obligation on the part of the State as it does to the reasonableness

of a county expectation that the State will finance half of its capital commitment.

Looking at the enabling act from the county point of view, it must be noted that *chapter* 64A of *Title* 18A dwells persistently upon the subject of financial feasibility. The Chancellor and then the Board of Higher Education must each independently find that the county has the financial capacity to support the institution. *N. J. S. A.* 18A:64A–2. But it is made clear in this part of the statute that capacity should be measured after taking into account "the state aid provided for in this chapter." *Id.*

In this matter the Legislature has, in effect, invited a county which cannot afford to pay back all the bonds to issue them anyway if it has the resources to amortize half.

The concept of "gratuity" does not fit into such a statutory setting. This is especially so when both *chapter* 64A of *Title* 18A and *Chapter* 12 of the *Laws* of 1971 introduce the opposite connotation with the terms "State's share," "State support" and "state aid" as well as the strong idea of assurance conveyed by the phrase "bonds or notes entitled to the benefits of this act," as it appears in the challenged statute.

Justice Swayze, in the dissenting opinion in *Wilson,* developed the "voluntary appropriation" point upon which the State relies in the case at hand:

The provision for the payment into a sinking fund of any moneys which shall be appropriated by any Legislature toward the principal, leaves it entirely optional with each successive legislature whether to appropriate or not, and in no way contravenes or modifies the express provision that the mortgage and bonds shall not create or constitute any indebtedness or liability of the state. Whatever a legislature may thus appropriate hereafter is a voluntary appropriation for a legitimate public purpose. [84 *N. J. Eq.* at 162]

In *Lanza, supra,* the court had occasion to uphold direct State payments as being "voluntary." They were authorized by the challenged Round Valley Act, empowering the State Commissioner of Conversation and Economic Development

to acquire land for a future water supply system, to pay municipalities money equal to the taxes lost by resulting condemnations, and to pay counties and municipalities the cost of relocating roads.

Although the money was to come from annual appropriations, no "debt" or "liability" was created according to the court. The payments had no direct relation to the purchase of property but were instead being made on a secondary level to reimburse local economic losses. It is noteworthy that the court, in approving these outlays, "presumably from available moneys in the Treasury" (27 *N. J.*, at 525), pointed out that they would be "eventually reimbursed from the proceeds of the sale of water thereby to be supplied." (At 524). Thus, the tax risk factor seems to have been weighed again.

But the court in *Lanza* made its decision turn on voluntariness: "There is no bargain or professed contractual, conventional or legal undertaking to recompense the given loss of tax revenue." (at 525). *McCutcheon* and *Behnke* were differentiated as presenting "radically different transactions involving 'moral and ethical compulsions,' such as might be deemed to arise out of the undertaking itself." (at 526).

Again, in *Passaic, supra,* a statute requiring the State to make annual payments from appropriations to a pension fund was held not to violate the constitutional debt limitation.

In *Lanza* and *Passaic* it could be said, in the language of Justice Swayze, that the respective statute "leaves it entirely optional with each successive Legislature whether to appropriate or not." *Wilson,* 84 *N. J. Eq.* at 162.

Such a recurring option is not made available to successive Legislatures in the framework of *chapter* 12 of the *Laws of 1971.* They will, instead, be locked into a fiscal structure built by those who enacted the subject statute. It has been designed to implement a sense of commitment declared at the very start of the text to be one "to satisfy the State's share of capital projects for county colleges" through payments of "State support" for repayment of county bonds.

Accordingly, the intention is to apply such payments to projects where, by the State's predetermination, there is "necessity" and to have the amount and time of payments coincide with a "maturity schedule" for the outstanding bonds. And the necessary sums, by direction, *"shall* be appropriated." Section 6; emphasis added.

Approval of a plan like that cannot be found in the *Lanza* opinion, where the court held that the State's financial participation was "subsidiary" and "secondary" to "the basic object of the legislation." 27 *N. J.* at 524. The rigid bond funding scheme specified by *chapter* 12 presents exactly what the dissenters in *McCutcheon* felt to be absent there as a touchstone connecting the State with a "debt" or "liability." In upholding the State Building Authority Act the justices in dissent observed that "Nowhere on the face of the act does the State itself assume any burden * * *." 13 *N. J.* at 73.

*Chapter* 12 bespeaks a "burden" of the State throughout its provisions. It is an undertaking to assist necessitous counties. The term "State support" appears five times in the first three sections of the act. Even Section 8, with its so-called "disclaimer," is not discordant with the theme. All it tells the world is that the State is not an obligor on the *bonds*. But there is nothing in the declaration which is at all inconsistent with the intention, clearly expressed before, to furnish bond-funding "benefits" to qualifying counties.

This court concludes, first, therefore, that by the expressed intent of *chapter* 12 of the *Laws of* 1971, a county has the right to expect the State to furnish half of the money necessary to pay principal and interest on bonds for capital projects after the State Treasurer's certification. That is the plain promise of the statutory plan, and the "disclaimer" in section 8 thereof says nothing to the contrary. All it really does is to warn that bondholders cannot look to the State. Thus, the State cannot validly contend, as it has in its briefs in this case, that "Any indebtedness created

under this Act is that of the county" and that "Its [the county's] tax revenues are pledged to repay the obligation," if by those words a lack of commitment to the county is meant.

Secondly, the State cannot deny to a county continuation of approved "support" after initial reliance upon it. When a board of chosen freeholders has acted to issue bonds on the strength of a certification, the funding necessary for the state share *"shall* be appropriated" according to section 6 of the statute. (Emphasis added).

Thus it is utterly unrealistic to make reference to "appropriations provided by law from time to time," as is done in the act's "disclaimer." There is nothing optional or voluntary or gratuitous about the State's financial participation. By *chapter* 12 it offers a maximum of $40,000,000 and directs payment out of appropriations. The annual amounts to be raised in that fashion will depend not on legislative will each year but upon the extent to which the standing offer of the enacting Legislature will be accepted.

Finally, since the State's position in the elaborate and rigid arrangement set up by *chapter* 12 cannot be termed voluntary, it must be viewed as being obligatory. The Legislature has fastened a legal responsibility upon the State, making it bound to render certain financial support to county colleges each year. By the definition provided in *Behnke* (13 *N. J.* at 28) a "liability" has been assumed because there is "legal responsibility" in that the State is " 'bound or obliged in law and justice' to do something."

█ The debt limitation provision of the Constitution has been violated. for the reason that the money necessary to satisfy the State's support of county colleges will come only from state appropriations. Therefore, *chapter* 12 of the *Laws of* 1971 is ineffective and void — it is unconstitutional because it has not been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State, as required by Art. VIII, § II, par. 3 of the 1947 State Constitution.

Summary judgment is granted to substituted plaintiff William Holster. The State's motion for summary judgment is denied.