THE STATE, EX REL. KITCHEN, DIR. OF LAW, CITY OF NORTH OLMSTED, OHIO, APPELLEE, *v.* CHRISTMAN, MAYOR, CITY OF NORTH OLMSTED, OHIO, APPELLANT.

(No. 71-474—Decided July 12, 1972.)

66

*Messrs. Squire, Sanders & Dempsey* and *Mr. Daniel J. O'Loughlin,* for appellee.

*Mr. Frank H. Lord,* for appellant.

O'NEILL, C. J. At the outset, it should be emphasized that this court examines this transaction, not for what it purports to be, but for what, in essence, it is. In short, this court looks through the form to the substance of the proposed transaction. "To view the matter otherwise would exalt form over substance and impair the integrity of our

constitutional government." *State, ex rel. Nevada Building Authority,* v. *Hancock* (Nev. 1970), 468 P. 2d 333, 337. Accord, *Tucson Transit Authority* v. *Nelson* (1971), 107 Ariz. 246, 485 P. 2d 816; *State, ex rel. Hall,* v. *Taylor* (W. Va. 1970), 178 S. E. 2d 48; *Phoenix* v. *Phoenix Civic Auditorium Assn.* (1965), 99 Ariz. 270, 408 P. 2d 818; *Board of Supervisors* v. *Massey* (1969), 210 Va. 253, 169 S. E. 2d 556; *Ayer* v. *Commr. of Administration* (1960), 340 Mass. 586, 165 N. E. 2d 885. See, also, *State, ex rel. Public Institutional Building Authority,* v. *Neffner* (1940), 137 Ohio St. 390, 30 N. E. 2d 705.

While there is no evidence in the record which is probative of the Company's method of financing the facility, there is other probative evidence which shows that the intent of the parties was to create, in effect, an installment purchase contract.

In the preamble of the ordinance it is stated that: "Whereas, this council finds and determines that for some time there has been and there continues to be an urgent necessity *for providing in this city * * * an outdoor swimming pool facility but that applicable constitutional tax rate limitations when considered with existing indebtedness * * * are such that the city cannot issue bonds* in an amount sufficient to provide for the construction by the city of such an outdoor swimming pool facility." (Emphasis added.)

The preamble also states that the Company had submitted "a proposal for the construction and development * * * of a *municipal* swimming pool facility * * * [with the] usual appurtenances * * * with provision for the city to acquire complete ownership * * * upon the expiration of such lease." (Emphasis added.)

Although the lease is to be executed simultaneously with the deed, the term of the lease does not begin until the facility is completed and possession is delivered to the city. The annual rental is $33,500, plus "an amount equivalent to any and all ad valorem taxes and special assessments and other similar impositions levied or assessed or

imposed by any taxing authority." The lease provided further that "In the event the city should fail to make any of the payments * * * *the item or installment so in default shall continue as an obligation of the city.*" (Emphasis added.) Although, by the terms of the lease, the Company is required to erect the facility at its sole expense, "No alterations shall be made in the work * * * except upon the written order of the city * * * and when so made, the value of the work added or omitted * * * *shall be added to or deducted from the quarterly rental payments.*" (Emphasis added.)

The Company also convenanted to keep the swimming pool and its equipment in proper working condition, unless "such structural and mechanical improvements are used for other than *their intended purpose,* to wit, the operation of an outdoor *municipal* swimming pool facility." (Emphasis added.) Moreover, the Company "waives, relinquishes and releases any and all rights to reentry or to retake possession of the project * * * and agrees not to exercise any such rights in the event of the failure of the city to make payment of the rent * * *. In the event of * * * [such] failure * * * the rights of * * * [the Company] shall be limited to any available remedy in law or equity to sue for and collect such rentals."

Upon termination of the lease, the Company's interest in the premises terminates "pursuant to the terms of the deed," and the premises, including the facility, become the absolute property of the city without additional cost. The deed provides that the interest of the grantee exists "only until the termination of the lease * * * and no longer." The deed also provides that, in the event "of the lessee's [sic] failure, refusal or inability to complete 'the project' * * * all of the right, title and interest conveyed hereby shall automatically terminate and revert to grantor."

The facts above mentioned show that the Company has no real interest in the premises after the delivery of possession to the city. The deed conveys a determinable fee which is, in effect, a lease of the premises for ten years,

*i. e.,* "only until the termination of the lease." The lease is, in effect, a contract for the construction and sale of a municipal swimming pool, with the usual provisions contained in construction contracts. The Company (lessor) obtained the property in consideration of the city's agreement to lease the premises. It cannot use or enjoy the premises, it cannot reenter the premises (except for repairs), nor can it look for payment of the "rentals" from a sale or reletting of the premises in the event of default of payment. Practically speaking, complete ownership of the premises remained in the city.

The court concludes that the parties actually intended a contract for the purchase and construction of a municipal swimming pool, with installment payments to be made quarterly during the following ten-year period.[3]

There is no claim of the "special fund" exemption here. Nor could there be, for this is not a self-liquidating project. The rule expressed in *State, ex rel. Public Institutional Building Authority,* v. *Griffith* (1939), 135 Ohio St. 604, 612, 22 N. E. 2d 200, should be reiterated here—a municipality does not create an indebtedness within the meaning of Section 11, Article XII of the Ohio Constitution, when it obtains a capital asset to be paid for wholly out of the income of the acquired property. The authorities are nearly uniform on this principle of state constitutional law.

Relator contends that a lease is not a debt within the meaning of Section 11 of Article XII, and cites as author-

---

[3]The determination by city council, that the quarterly payments are "fair and reasonable" rentals (not payments for the acquisition of an asset), is not binding on this court. In *State, ex rel. Public Institutional Building Authority,* v. *Neffner, supra* (137 Ohio St. 390), the General Assembly specifically provided that the bonds "shall not be or be construed to be unconditional promises to pay." This court, after analysis, found the promises to be unconditional. See, also, *State, ex rel. Hall,* v. *Taylor, supra* (178 S. E. 2d 48); *State Office Bldg. Comm.* v. *Trujillo* (1941), 46 N. M. 29, 120 P. 2d 434. See, generally, 15 McQuillian, Municipal Corporations (3 Ed.), Sections 41.11 to 41.18, pages 321 to 342.

ity the second paragraph of the syllabus[4] of *State, ex rel. Ross,* v. *Donahey* (1916), 93 Ohio St. 414, 113 N. E. 263. The *Donahey* case, although interpreting Article VIII of the Ohio Constitution, is equally applicable under Article XII. However, that case does not support respondent's contention, for the instrument executed in *Donahey* was truly a lease. In the instant case, the instrument is not a bona fide lease, but an installment purchase contract.

The court concludes that the entire contract price is a present indebtedness of the city. The city has presently obligated itself to make future payments, and the Company has a present right to compel each succeeding administration to make those payments.[5] The city's obligation under the contract is a continuing one, and no succeeding city council can refuse to appropriate available funds (generated by its taxing power) for payment. Had bonds been issued and the taxing power of the city pledged for their payment, a debt within Section 11 of Article XII would have been created. A pledge to make future appro-

---

[4]"The necessary and current expense growing out of the rental of suitable and necessary quarters for the transaction of the state's business, for which appropriation has been made by the state Legislature, is not a debt or liability within the inhibition of the provisions of the Constitution."

[5]The first paragraph of R. C. 715.011 provides:

"Each municipal corporation may lease for a period not to exceed forty years, pursuant to a contract providing for the construction thereof under a lease-purchase plan, buildings, structures, and other improvements for any authorized municipal purpose, and in conjunction therewith, may grant leases, easements, or licenses for lands under the control of the municipal corporation for a period not to exceed forty years. Such lease shall provide that at the end of the lease period such buildings, structures, and related improvements together with the land on which they are situate shall become the property of the municipal corporation without cost."

While R. C. 715.011 permits municipalities to execute long-term leases, it does not purport to, nor could the General Assembly exempt such long-term leases from the constitutional debt limitation expressed in Section 11 of Article XII of the Ohio Constitution.

priations of tax revenues must be treated no differently.[6] See *State, ex rel. Nevada Building Authority,* v. *Hancock, supra* (468 P. 2d 333). "There is no distinction between a debt payable presently and one payable in installments in the future, except as to time of payment." *Button* v. *Day* (1964), 205 Va. 629, 644, 139 S. E. 2d 91. Compare *Kasch* v. *Miller* (1922), 104 Ohio St. 281, 135 N. E. 813. "The majority rule is that such a purchase gives rise to a debt in the amount of the payments to be made at future dates." *Balenson* v. *Maryland Airport Authority* (1969), 253 Md. 490, 497, 251 A. 2d 870. Nor does the fact that more than one action would have to be brought to compel payment change the status of the debt. *Phoenix* v. *Phoenix Civic Auditorium Assn., supra* (99 Ariz. 270), at 289. In fact, in every case in which the instruments were found to be purchase agreements, the court did determine that the contract was a present indebtedness of the state or political subdivision for the entire amount, otherwise it could not have concluded that the agreement violated the applicable state constitutional provision.[7] Thus, because this court concludes that the lease agreement is, in effect, an installment purchase contract, the entire contract price is a present indebtedness of the city.

Relator also contends that a lease to be paid by annual appropriations from the general revenue fund is not "bonded indebtedness," as that phrase is used in Section 11 of Article XII. He maintains that this phrase "re-

---

[6]If such an unconditional obligation of payment did not exist, but instead, the city were free to periodically choose whether to continue to appropriate monies for the purpose of acquiring eventual complete ownership of the property in question, an entirely different question might have been presented.

[7]At common law, and today, rental payments under a lease are not present debts until the day upon which they are due and payable even if it is a long-term lease. Whereas, under a contract of purchase the entire contract price is a presently incurred indebtedness even if the consideration is to be paid in installments over an extended period of time. Thus, a true lease is distinquishable from an installment purchase contract, and the common-law rule governing "rentals" is not applicable in a true purchase transaction.

lates only to what is commonly understood in public financ-ing to be bond issues.'' Literally speaking, a lease is not bonded indebtedness. However, it has already been de-termined that the instrument is not a lease but a contract to purchase a capital asset with a present obligation to pay future installments. The city has bound itself by a formal agreement to make specific future payments of money. Such a written agreement, obligating the city uncondition-ally to make such future payments constitutes a ''bond'' of the city, and thus creates a ''bonded indebtedness.''

That Section 11 of Article XII was designed to pre-vent this type of evasion of the debt limitation is clear from a reading of the Debates and Proceedings of the Con-stitutional Convention of 1912. The purpose of the amend-ment was not only to limit the dollar volume of the bonds which could be floated by a municipality, but also to place fiscal responsibility on its officials and to retain a modicum of fiscal control in the taxpayers. Delegate Fackler (of Cuyahoga County) summed up the view of the delegates when he stated that unlimited ability to incur debts with-out provision for their liquidation ''would lead to disaster * * * [therefore] let this limit be placed so that this Con-stitutional Convention can say to the different subdivi-sions, 'You must pay on your debts as you contract them, and you must not pass the burden onto succeeding genera-tions'.'' (Page 1634.) Consistent with that summation is the accurate statement in *State, ex rel. Hall*, v. *Taylor, supra* (178 S. E. 2d 48), at page 58: ''If the statute [or-dinance] in question * * * is held constitutional, there would never be any need for general obligation bonds to be voted on by the people for any purpose.''

This is not a ''pay as you go'' type transaction. It un-conditionally binds each succeeding city council to appro-priate annually $33,500, plus taxes and assessments, to pay the indebtedness even if the succeeding council should de-termine that the money was spent unwisely.[8] It is a prior

---

[8]Bearing in mind that the city's obligation to pay rent is uncon-ditional, the recent case of *New Liberty Medical and Hospital Corp.* v. *E. F. Hutton and Co.* (Mo. 1971), 474 S. W. 2d 1, is especially rele-

city council which determines future appropriations, not the wisdom of the then presently elected officials or their responsiveness to the demands of their then present constituents. See *State* v. *Medbery* (1857), 7 Ohio St. 522. The purpose of Section 11 of Article XII is to prevent that situation. Accordingly, this court concludes that the proposed transaction falls within the purview of activity proscribed by Section 11 of Article XII.

Relator also asserts that the weight of authority supports the proposition that a transaction, like the one in question, is not indebtedness, and is properly payable out of current operating revenues. A careful examination of a number of recent cases which decide this question leads to the court's conclusion that the majority of cases do not uphold relator's position. Relator relies heavily on the cases of *Clayton* v. *Kervick* (1968), 52 N. J. 138, 244 A. 2d 281, and *Hall* v. *Mayor* (1969), 252 Md. 416, 250 A. 2d 233. As these cases are representative of the other cases relied on, the discussion is limited to those two.

In *Clayton, supra,* the Legislature enacted a statute which empowered the New Jersey Educational Facilities Authority to borrow money and issue bonds which, however, were not to be deemed a debt of the state, and did not

---

vant. There, at page 6, the court found such an obligation "is more than the usual obligation of lessee to pay rent for premises furnished"; that it "is assuming indebtedness which must be paid in all events."

Continuing, at page 7, the court concluded "this case does not present a situation wherein a governmental agency has agreed merely to pay future rentals as they accrue under a long-term lease. Rather, *we are considering the effect of the absolute and unconditional* undertaking which the hospital district assumed. *Such absolute agreement to pay* created indebtedness on the part of the hospital district which * * * it could not assume unless authorized by the required vote of the people." (Emphasis added.)

Likewise, New Jersey (a jurisdiction which relator contends supports his position) would appear to hold that a debt was created if the legislation authorizing the issuance of the bonds also *required* a future legislature to make the necessary appropriations. See *Holster* v. *Board of Trustees* (1971), 59 N. J. 60, 70-73, 279 A. 2d 798. See, also, *Holster* v. *Board of Trustees* (1971), 114 N. J. Supp. 228, 275 A. 2d 762.

pledge the faith and credit of the state, nor was the taxing power of the state pledged to their payment. The bonds were payable from revenues or other moneys of the Authority. Moreover, the Legislature intended that the projects to be undertaken would be revenue-producing facilities.

In concluding that the bonds were not a debt of the state, the New Jersey Supreme Court adopted the lower court's finding that the debts were essentially self-liquidating. It adopted the reasoning of the dissenting opinion in *McCutcheon* v. *State Building Authority* (1953), 13 N. J. 46, 97 A. 2d 663, and distinguished the *McCutcheon* majority, stating, at page 154, that in *McCutcheon*, the rental payments "would come *entirely* from legislative appropriations," while the rentals in *Clayton* "were intended to come mainly from sources unrelated to legislative appropriations. With that in mind, its operations may be favorably compared to the many self-liquidating projects which have been sustained.'"

In the view of this court, the projects in *Clayton* are not exclusively self-liquidating. In the event of a failure to make payment the Legislature, although not obligated, would appropriate the necessary funds. It is inconceivable that the Legislature would not do so, since the public credit of the state would be at stake. *State, ex rel. Nevada Building Authority,* v. *Hancock, supra* (468 P. 2d 333);

---

[9]Under a somewhat different approach, the Supreme Court of Appeals of West Virginia, in *State, ex rel. State Bldg. Comm.,* v. *Moore* (W. Va. 1971), 184 S. E. 2d 94, upheld a modified plan for the issuance and sale of bonds for the construction of certain buildings and related facilities. It was found that the bonds for the Department of Highways Building could be properly paid for from the State Road Fund because such building was a reasonable necessary and proper incident of administering the public highway system of the state.

Bond payment for the other buildings, from the profits derived from the sale of alcoholic beverages, was found constitutionally permissible because the debt was not payable "with funds arising from general revenue appropriations or from any tax, excise or otherwise, imposed by law upon taxpayers." (Page 106.)

*State Office Bldg. Comm.* v. *Trujillo* (1941), 46 N. M. 29, 120 P. 2d 434. Notwithstanding that assumption, "the test is not whether a future Legislature [or city council] is required to make such appropriations. The test is the authority to do so. * * * [and] it is not necessary for this court to wait until some future Legislature [or city council] refuses to make an appropriation to make a determination of the legality of this procedure." *State, ex rel. Hall,* v. *Taylor, supra* (178 S. E. 2d 48), at 58. This court finds the instant case to be closer to *McCutcheon* than *Clayton,* for, here, the Company retained the right to compel future administrations to allocate funds for the payment of "rentals." No such right existed in *Clayton.*

In *Hall* v. *Mayor, supra* (252 Md. 416), the city owned vacant land and proposed to lease it to the highest bidder, who was to construct on it a warehouse at his own expense, and thereafter sublease the property back to the city for the same term as the lease. In the bid accepted, the annual rental was $96,000 and the city was given an option to purchase. If the option was not exercised in 30 years the warehouse was to be removed and the land reverted to the city. To finance the transaction, the contractor mortgaged its leasehold interest; however all mortgages were subject to the city's interest. The Maryland court, after stating that a city may be a lessee of buildings for the performance of its ordinary and necessary municipal functions, relied heavily on the "special fund" case of *Wyatt* v. *State Roads Comm.* (1938), 175 Md. 258, 1 A. 2d 619, to uphold the validity of the transaction. In the view of this court, a "special fund" case is not judicial support for lease-financing when the project undertaken is not exclusively self-liquidating. Though the court expresses no view on the facts of that case, we note that the court there found the lease to be a "bona fide lease." In the instant case, this court does not find a bona fide lease.

Paraphrasing the Arizona Supreme Court,[10] we con-

---

[10]*Phoenix* v. *Phoenix Civic Auditorium Assn., supra* (99 Ariz. 270), at 293.

clude by stating: This court cannot make constitutional limitations meaningless by judicial circumvention in order to assist the city in acquiring a needed recreational facility. Nor does this court pass upon the desirability of such a constitutional debt limitation. The court must apply the applicable constitutional provision, including the purpose for which it was created, as the court finds it. The court cannot close its eyes to the fact that the lease arrangement is nothing more than an installment purchase plan by the city to acquire a recreational facility, binding the city and its taxpayers irrevocably to a program of successive appropriations for a period of ten years. Without a vote of the people, this is exactly what Section 11 of Article XII was designed to prevent. If today this provision is deemed unwise, the remedy is a constitutional amendment.

For the foregoing reasons, this court holds that the ordinance containing the proposed transaction, when considered as a whole, falls within the purview of activity proscribed by Section 11, Article XII of the Ohio Constitution. Thus, the ordinance which authorizes and directs respondent to execute these instruments is unconstitutional and invalid. Mandamus is not available as a remedy to compel an act which is unconstitutional.

In view of this conclusion, the court need not consider the other arguments discussed in relator's brief.

For the foregoing reasons, the judgment of the Court of Appeals allowing the writ of mandamus is reversed.

*Judgment reversed.*

SCHNEIDER, HERBERT, CORRIGAN, STERN and LEACH, JJ., concur.

BROWN, J., not participating.