537 P.2d 986

**Edgar F. WHITE, Plaintiff, Appellee and Cross-Appellant,**

**v.**

**KAIBAB · ROAD IMPROVEMENT DISTRICT, Robert Stark, B. W. Burns and Henry Haws, constituting the Board of Directors of Kaibab Road Improvement District, Rhea Woodall, Clerk of the Board of Directors of Kaibab Road Improvement District and Robert Esterbrooks, Superintendent of Streets of Kaibab Road Improvement District, Defendants, Appellants, and Cross-Appellees.**

**No. I CA–CIV 2559.**

Court of Appeals of Arizona, Division 1, Department A.

July 1, 1975.

Rehearing Denied Aug. 8, 1975.

Review Granted Oct. 9, 1975.

Gust, Rosenfeld, Divelbess & Henderson by Fred H. Rosenfeld, Jane Rex Greer, Phoenix, for appellee and cross-appellant.

Wilson, Jones, Morton & Lynch by Robert G. Auwbrey, Earnest A. Wilson, San Mateo, Cal., Ryley, Carlock & Ralston by Joseph P. Ralston, and Moise Berger, Maricopa County Atty., by David B. Krom, Deputy County Atty., Phoenix, for appellants and cross-appellees.

## OPINION

OGG, Presiding Judge.

This appeal requires resolution of two issues of law: (1) the sufficiency of a title to a bill which promulgated an "alternate procedure for the formation of county improvement districts" and (2) the constitutionality of the alternate procedure.

In 1945, Chapter 43 was enacted; the chapter was entitled:

*"An Act*

*Relating To The Organization Of Districts To Make Street, Sewer And Other Local Improvements By Special Assessments In Unincorporated Towns Or Settlements, Authorizing The Issuance Of Bonds For Such Improvements, Providing For The Collection Of Said Assessments And The Guarantee And Payment Of Said Bonds, And Authorizing Such Districts To Levy And Collect Taxes For The Operation And Maintenance Of Said Improvements And The Streets Within Such Districts."*

This chapter now appears as Title 11, Chapter 5, Article 1 (§ 11–701 et seq.). In substance, it affords a procedure by which an unincorporated territory may create an improvement district governed by a board of supervisors. The district then calls for bids and lets the contract to the "lowest responsible bidder." Prior to bidding on a job, a contractor must arrange to finance himself during the course of construction. This is necessary because Article 1 provides for assessment on the benefited landowners only after the improvement is completed. After completion of the improvements, the assessment is made and a warrant is delivered to the contractor authorizing him to demand cash payment from the landowners. At the end of a 45 day period, interest bearing bonds are issued to the contractor; these bonds, coupled with the cash payments received, constitutes full payment.

As noted previously, the contractor must negotiate financial commitments prior to his submission of a bid. Generally, the contractor will find a financier who will commit construction funds and purchase the bonds when the project is complete. The financier, in making the commitment,

is unable to accurately predict the stability of the money market when he ultimately obtains possession of the bonds. Because of this unpredictability the one committing himself to take the bonds after initial delivery to the contractor "hedges his bet" and writes into the commitment a "safety factor," the resultant effect of which is to substantially increase the cost of construction.

An alternate procedure was proposed to encourage the elimination of the "safety factor," thereby significantly reducing the cost of the improvement. Under this proposal, assessments for the improvement are made prior to the commencement of construction. Once the assessments are made a cash payment period transpires in which those to be benefited by the improvement pay their respective share. Any deficiency is made up by the issuance of bonds. The net result of this procedure is to provide a cash supply for the contractor to execute the improvement. Since money is available to the contractor at the start of the project, the need for outside financing is obviated. The streamlining of this procedure results in an estimated one-third savings in the total cost of the improvement.

This proposed procedure was expressed in Senate Bill 283, now existent in the form of Title 11, Chapter 5, Article 1.1, § 11-761, A.R.S.[1] It is commonly referred to as "front end assessment."

The Kaibab Road Improvement District was formed pursuant to § 11-761, A.R.S., and undertook construction of certain road improvements with the assessment of the benefited lands. Appellee Edgar F. White brought an action, protesting the front end assessment and stating that the title was insufficient in that it violateed Article 4, Part 2, § 13 of the Arizona Constitution, A.R.S., which requires that every act embrace but one subject matter and that such subject must be expressed in the title. In the alternative, he contended that even if the title was sufficient the act still must fail because of various other constitutional infirmities. The trial court held in favor of appellee White on the insufficiency of title issue; however, on the remaining constitutional issues, found in favor of appellant Kaibab.

Kaibab pursued this appeal, claiming that the trial court erred in its ruling on the title issue. Appellee White filed a cross-appeal from the unfavorable determination of the remaining constitutional issues. Forest Lake Estates Water Improvement District was permitted to file an amicus brief, buttressing those arguments presented by Kaibab.

### THE TITLE ISSUE

Chapter 127, Senate Bill 283, Laws of 1971, which is the basis of this title controversy, states:

*"An Act*

*Relating To Counties: Providing An Alternate Procedure For The Formation Of County Improvement Districts, And Amending Title 11, Chapter 5, Arizona Revised Statutes, by Adding Article 1.1."*

Appellee White urged before the trial that the act, now in the form of Title 11, Chapter 5, Article 1.1, was violative of Article 4, Part 2, § 13 of the Arizona Constitution. Section 13 states:

"Every Act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title."

---

1. It should be noted that Senate Bill 1347 was approved by the Governor on June 6, 1975. This new act purports to clarify some of the problems discussed in this appeal by amending Title 11, Chapter 5, Article 1, A.R.S., by adding Sections 11-760 and 11-760.01, by repealing Title 11, Chapter 5, Article 1.1, A.R.S., and amending Title 11, Chapter 5, A.R.S., by adding a new Article 1.1.

The trial court concluded that the Act provided a new method

". . . by which an improvement district may order the construction of improvements and an alternative method of levying assessments and the issuance of bonds for the construction of the improvements."

The court determined that "[t]he substance of the Act [did] not relate, directly or indirectly, to an alternative method for the formation of improvement districts," and consequently that the title violated the relevant provision of the Arizona Constitution.

Appellant urges this court to reverse the trial court. It is contended that the title is sufficient, as written, and not violative of Article 4, Part 2, Section 13. In support of the position, alternate grounds are advocated upon which the title can be sustained. Temporarily casting aside subsidiary arguments, appellants' primary contentions are that the title embraces only one subject and all matters in the Act are properly connected with that subject.

We have determined that, although this title problem is a close legal question, the trial court's determination that the title violated Article 4, Part 2, Section 13 of the Arizona Constitution cannot be upheld.

■ The Arizona Supreme Court has repeatedly expressed its interest in sustaining the acts of our legislature. In Re Lewkowitz, 70 Ariz. 325, 220 P.2d 229 (1950); Board Of Regents v. Sullivan, 45 Ariz. 245, 42 P.2d 619 (1935). Illustrative of this policy is the court's statement that it will not strike down an act "unless satisfied beyond a reasonable doubt of its unconstitutionality. . . ." State v. Gastelum, 75 Ariz. 271, 255 P.2d 203 (1953). In a further clarification of that standard the court also stated that:

"The burden therefore is . . . to convince us that the subject of the act is not reasonably embraced in the title thereof, by as great a weight of evidence and reasoning as would be required to be presented by the state to convict a defendant of murder." State v. Davey, 27 Ariz. 254, 258, 232 P. 884, 885 (1925).

Acceptance of this stringent burden has led the court to sustain titles to enactments when they are: germane to or properly connected with the general subject, In Re Miller, 29 Ariz. 582, 244 P. 376 (1926); sufficiently full and comprehensive as to indicate what is to follow in the way of legislation, Morris v. State, 40 Ariz. 32, 9 P.2d 404 (1932); directly or indirectly related to the body of the act, In Re Lewkowitz, 69 Ariz. 347, 213 P.2d 690 (1950), reversed on other grounds, 70 Ariz. 325, 220 P.2d 229 (1950).

■ On review we are of the opinion that while the main thrust of the title is the formation of a county improvement district, the financing necessary to accomplish the formation is germane to and properly included within the title. The sole reason a district is formed is to accomplish a specified improvement. It is difficult for us to conceive that the matter of assessment, which is the means of paying for the improvement, is somehow foreign to the concept of formation.

As previously noted, the purpose of the constitutional provision is to

". . . fairly . . . apprise legislators, and the public in general, of the subject matter of the legislation, and of the interests that are or may be affected thereby, and to put anyone having an interest in the subject matter on inquiry." In Re Lewkowitz, 70 Ariz. at 331, 220 P.2d at 233.

We are not convinced beyond a reasonable doubt that the title fails to put an interested party on adequate notice of the contents of the bill and therefore we hold the title to be constitutionally sufficient. State v. Harold, 74 Ariz. 210, 246 P.2d 178 (1952). The determination by the trial court that the title was constitutionally defective is reversed.

## THE CROSS–APPEAL

Edgar White claims on cross-appeal that the front end assessment violates Article 2, § 17 of the Arizona Constitution,[2] dealing with eminent domain in several respects.

His first contention is that the levy of assessment is tantamount to a taking. Since the levy, or take, occurs prior to the construction of the improvement, there is no benefit conferred upon him. The absence of a *quid pro quo* is said to effectively take property of the landowner without just compensation being paid in return. This, it is contended, violates the Arizona Constitution.

The argument, however, fails to distinguish between the power of eminent domain and the power of taxation; reliance upon *Gardiner v. Henderson*, 103 Ariz. 420, 443 P.2d 416 (1968), is therefore misplaced. The assessment was made to provide funds for the accomplishment of an improvement. Authority for the assessment comes from beneath the umbrella of the power of taxation:

> "[S]pecial assessments are a peculiar species of taxation, and are made upon the assumption that 'a portion of the community is to be specially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds.'" *Norwood v. Baker*, 172 U.S. 269, 280, 19 S.Ct. 187, 191, 43 L.Ed. 443 (1898).

 It is well settled that special assessments are referrable to the power of taxation and not to eminent domain. *Houck v. Little River Drainage District*, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266 (1915); *Bauman v. Ross*, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897). Mere incantation of the phrase "power of taxation" does not confront the problem which cross-appellant seeks to raise, that at the time of the levy no benefit had been received by the one being assessed.

We have discovered cases which verbally refer objection under eminent domain to power of taxation and end the inquiry, observing that special assessments ". . . have no relation to the exercise of the power of eminent domain and hence constitutional provisions respecting this right have no application." *Appeal of Public Service Electric & Gas Co.*, 18 N.J.Super. 357, 87 A.2d 344 (1952). There are opinions which specifically approve or disapprove of front end assessment procedures without, in our opinion, a satisfactory explanation of the decision. *Quinlan v. Cross*, 102 N.J.L. 654, 133 A. 398 (1926) (disapproving); *Alber v. Kansas City*, 138 Kan. 184, 25 P.2d 364 (1933) (disapproving); *Aloha Sanitary District v. Wilkens*, 245 Or. 40, 420 P.2d 74 (1966) (approving); *Hayne v. City & County of San Francisco*, 174 Cal. 185, 162 P. 625 (1917) (approving).

The subtlety of the problem raised by Mr. White is realistically captured in *Davidson v. New Orleans*, 96 U.S. 97, 24 L. Ed. 616 (1877). We quote at length from

2. § 17. Eminent domain; just compensation for private property taken; public use as judicial question

Section 17. Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches, on or across the lands of others for mining, agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having first been made, or paid into court for the owner, and no right of way shall be appropriated to the use of any corporation other than municipal, until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public."

that opinion for we believe it to be a perceptive characterization of the issue:

"Of a similar character is the objection much insisted on, that, under the statute, the assessment is actually made before, instead of after, the work is done. As a question of wisdom—of judicious economy—it would seem better in this, as in other works which require the expenditure of large sums of money, to secure the means of payment before becoming involved in the enterprise; and if this is not due process of law, it ought to be . . . Id. at 100. That whenever by the laws of a State, or by State authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, whether it be for the whole State or of some more limited portion of the community, and those laws provide for a mode of confirming or contesting the charge thus imposed, in the ordinary courts of justice, with such notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections." Id. at 104–05.

While there are objections which can be made to front end assessments, they are to be made in terms of due process of law. Article 1.1, A.R.S., provides for hearings, notice and various other procedures which guarantee the landowner due process of law as it relates to front end assessments. It should not be overlooked that this alternate form of assessment saves the landowner approximately one-third the total cost of the improvement. Moreover, it has been stated, and we agree, that:

"[t]he state in its discretion may lay . . . assessments in proportion to position, frontage, area, market value, or to benefits estimated by commissioners. . . . And, as [has been] said, unless the exaction is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property,

it cannot be maintained that the state has exceeded its taxing power." Houck v. Little River Drainage District, 239 U.S. at 265, 36 S.Ct. at 61.

In this case no objections are made to the amount of assessment in relation to the benefits to be received. The only objection is that the assessment occurred prior to receipt of the benefit. We do not believe this objection, in the absence of some other showing, is adequate.

There appears to be a rational relationship between the amount assessed and the benefit to be received. Furthermore, this procedure saves the property owner one-third of the completion cost. In the absence of a showing of deprivation of due process of law, we are of the opinion that the front end assessment procedure is not constitutionally objectionable.

 Next, cross-appellant contends that issuance of bonds at the time of assessment may, if the improvement is abandoned or not completed, result in the property owners paying off the bondholders without receiving the benefit of the improvement; this, it is contended, violates Article 2, section 17, the eminent domain provision. As already noted, the provision under which cross-appellant White seeks shelter has no applicability to special assessments. However, as before, this conclusion does not legitimately respond to the objection.

We do not deny the complexity of the problems raised by the hypothetical abandonment posed by Mr. White. The relationships and rights among bondholders, property owners and the district are obviously difficult to untangle. This complexity itself, however, cannot stand as an objection. A.R.S. § 11–761.06A provides for modification of assessments when a contingency arises. An indebtedness arising from an abandonment is properly levied on the land of the district. Fidelity National Bank & Trust Co. v. Morris, 127 Kan. 283, 273 P. 425 (1929). Another statement of rights of the property owner is that, if abandonment occurs there is a

failure of consideration and, upon such failure, the common law entitles the landowner to restitution. District of Columbia v. Thompson, 281 U.S. 25, 50 S.Ct. 172, 74 L.Ed. 677 (1930). Actions may also exist against the contractor if his abandonment was *improper*.

We are of the opinion that the contingencies posed by cross-appellant White, while difficult, are solvable under the common law and also are contemplated to some degree by Article 1.1. There are innumerable variables that might affect the final resolution of an abandonment. Those variables should be considered if and when the time arises.

While it is conceivable that an abandonment *might* occur and that *no* benefit would inure to the property owner, we are unpersuaded that such a contingency invalidates the procedure. See, Davies v. City of Los Angeles, 86 Cal. 37, 24 P. 771 (1890).

 Cross-appellant's next contention is that the provision of Article 1.1, § 11–761.03C, A.R.S., which makes the improvement district liable for the payment of district bonds in the event of a deficiency of the payment of assessments, violates Article 7, § 13,[3] of the Arizona Constitution because that liability was not premised upon voter approval.

The Arizona Supreme Court has clearly held that assessments which are levied in relation to benefits received do not require voter approval. City of Globe v. Willis, 16 Ariz. 378, 146 P. 544 (1915). Cross-appellant's argument, however, is that no benefit is being received in exchange for the supplemental levy and, consequently, it is a general liability which requires voter approval. Tucson Transit Authority, Inc. v. Nelson, 107 Ariz. 246, 485 P.2d 816 (1971).

Simply stated, the argument is: An improvement is originally assessed at a stated amount—$X; then it comes to light that deficiencies exist and it is necessary to levy supplemental assessments—$Y. The property owner is now going to pay $(X+Y) for the same improvement originally assessed at $X. The cross-appellant continues that since he is now paying $(X+Y) for the same improvement originally assessed at $X, and is receiving the same benefit, then obviously the supplemental assessment is not based on improvements to his property and therefore assent to such liability can only be accomplished through voter approval.

We are not persuaded by this argument. § 11–761.03C provides for supplemental assessments to "be made on the properties within the district * * * apportioned in the same manner as the original assessment," i. e., in proportion to benefits received. The deficiencies are charged against the property in the district and when they are "levied against the property particularly benefited [and] are not an 'indebtedness or liability' within the contemplation of the constitutional provision, and . . . the same may be incurred without submission to a vote of the people." McGilvery v. City of Lewiston, 13 Idaho 338, 90 P. 348 (1907); Jones v. Hammer, 143 Wash. 525, 255 P. 955 (1927).

The supplemental assessment is an expected cost of the improvement. Deficiencies are no less a cost of an improvement than is the "safety factor" in a back end assessment which costs the property owner approximately one-third more than the front end procedure. While the same improvement is made whether the assessment is at the front or at the back, the cost is substantially different. We point this out only so it is recognized that the cost of an improvement varies; deficiencies, in the front end assessment, are but a cost of doing business under that procedure.

3. Article 7, § 13, states:
"Section 13. Questions upon bond issues or special assessments shall be submitted to the vote of real property tax payers, who shall also in all respects be qualified electors by this State, and of the political subdivisions thereof affected by such question."

The United States Supreme Court has considered the objections cross-appellant raises and has rejected them in Kadow v. Paul, 274 U.S. 175, 47 S.Ct. 561, 71 L.Ed. 982 (1927). In approving of the supplemental levy the Court observed that if:

". . . some of the assessed land fails to pay the assessment and is appropriated and sold, the distribution of the deficit thus arising, to be included in another assessment, is only meeting the to be expected cost of the improvement. When the operation of the law works uniformly as against all parts of the assessment district, and results in a higher cost of the improvement, and an increased assessment on all the owners of the land who have paid, it violates no constitutional right . . ." Id. at 181, 47 S. Ct. at 563.

It should be noted that if a supplemental levy is made, and if a property owner can show the total assessment is out of proportion to the benefits received, then he would be entitled to relief. Kadow v. Paul, supra; See Weitz v. Davis, 102 Ariz. 40, 424 P.2d 168 (1967). This is not the issues which cross-appellant places before this court however, and we therefore hold that the supplemental levy challenged herein does not require voter approval.

The final contention on cross-appeal is that Article 1.1 does not expressly or impliedly provide for assessment prior to the completion of the improvement. In the absence of such authority it is claimed that no front end assessment can be said to exist. McClintock v. City of Phoenix, 24 Ariz. 155, 207 P. 611 (1922).

Interpretation of legislative enactments requires that this court remain sensitive to the intentions of the legislature. Arnold Construction Co., Inc. v. Arizona Board of Regents, 109 Ariz. 495, 512 P.2d 1229 (1973). We believe the intention of the legislature is quite clear; front end assessments were promulgated to afford economies to property owners. Consequently, in the absence of unambiguous language to the contrary, this court shall give effect to the intention of the legislature.

An assessment is levied when the assessment roll is confirmed by the Board of the District. Fahey v. City Council of Sunnyvale, 208 Cal.2d 667, 25 Cal.Rptr. 314 (1962); City of Chicago v. Sullivan Machinery Co., 269 Ill. 58, 109 N.E. 696 (1915).

Preliminarily, § 11–761E, A.R.S., provides for the preparation of the assessment roll:

"E. The plans and specifications shall be accompanied by a diagram of the assessment district and an assessment apportioning the total estimated costs among the several parcels of land shown on the diagram, in the proportion of the benefits respectively to be received by them."

After the assessment roll is prepared it is confirmed by the mandate of § 11–761.-01B at the time the improvement is ordered. Section B states:

"B. At the time of ordering the improvements as provided in § 11–718, the board shall, by resolution, approve and confirm the diagram and assessment."

Obviously, the improvements are ordered before they are begun. When ordered, the assessment is confirmed; we conclude that the levy of assessment is clearly provided for in Article 1.1, contrary to cross-appellant's contention.

Counsel for cross-appellant has effectively presented other potential problems relating to this issue. We believe, however, that these questions should be resolved as they arise. Legal generalizations which are stated gratuitously, apart from specific, well-framed, adversary confrontations often serve as unsolid foundations for evolving case law.

Counsel for all parties have effectively advocated their respective interests. We hold that the trial court erred in finding the title to Chapter 127, Senate Bill 283, violative of Article 4, Part 2, § 13 of the

Arizona Constitution and reverse its judgment in favor of Edgar F. White. Likewise, we affirm the trial court's decision in favor of Kaibab Road Improvement District as to those issues raised on cross-appeal.

JACOBSON and EUBANK, JJ., concur.